## Pacific Mut. Life Ins. Co. v. Arnold.

(Decided Dec. 11, 1935.)

268

LA VEGA CLEMENTS, CLEMENTS & CLEMENTS, BEN D. RINGO, LEO T. WOLFORD, WM. MARSHALL BULLITT and EUGENE B. COCHRAN for appellant.

E. B. ANDERSON for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming.

On March 18, 1921, the appellant issued to the appellee, James E. Arnold, its "Non-cancelable Income Policy" by which it insured him against disability resulting from accidental injury or sickness; "such disability in both cases to be such as will result in continuous loss of business time." The indemnity was at the rate of $500 a month during the continuance of the disability "until such time as the insured engages in a gainful occupation," except during the first three months of disability.

The insured was then, president and general manager of a department store in Owensboro and actively engaged in conducting it. On September 8, 1931, Mr. Arnold suffered a severe attack of angina pectoris. He was confined to his bed and home until some time in December, when he went to Florida and remained there under the care of physicians until May, 1932. He returned to Owensboro for a few days and then went to Atlantic City. In the fall he visited Battle Creek, and thence returned to Florida for the winter of 1932-33. The stipulated indemnity was paid from December 8, 1931, until August 8, 1932, when the company declined further payments, as Arnold was advised, because he had misrepresented the condition of his health and prior medical treatment in order to procure the policy. Several suits were subsequently filed to recover the accrued sums claimed by the insured. The defenses raised were the alleged false and fraudulent misrepresentations and the cessation of disability. A judgment for $7,000 was returned in favor of the plaintiff on the trial of the consolidated cases.

On the appeal it is contended that there was error of the court in overruling the defendant's motion for a directed verdict based upon both of the defenses pleaded. The request for reversal of the judgment is also based upon the claim of erroneous instructions and admission of incompetent evidence.

■ In applying for the insurance, Arnold filled out the conventional form relating to the present and past condition of his health. He represented that he had never had, and did not then have, any bodily infirmity or deformity, and was in no respect maimed or in an unsound physical condition. The following questions and answers were asked and given:

"Have you now or have you ever had any of the following complaints, symptoms or diseases?

Asthma or Shortness of Breath..............No
Any disease of the stomach or bowels.........No
Any disease of the Rectum..................No
Difficult or frequent urination................No
Any Bladder or Kidney disease...............No

Have you ever consulted or been treated by a physician or any other practitioner for any ailment or disease? (If so, give dates and full particulars.) (Ans) Not since childhood."

Mr. Arnold testified that for 10 or 12 years before this time he had been going to Battle Creek Sanitarium every year or so for rest and recreation for 10 days or 2 weeks. Sometimes he went through the clinic for examination, but was never treated for any ailment or disease. The basis of the claim of misrepresentation is a paper on file at the sanitarium purporting to give a history of Arnold's physical condition in September, 1919. Dr. M. A. Mortesen, of the sanitarium staff, testified that in September, 1919, Arnold was there for treatment and rest, and that he had him under observation. The foregoing history of the case had been made by him or under his direction. It showed: "Patient applies for examination and treatment for returned constipation," and "returned for examination and treatment." There are a number of negative statements of symptoms. Stress is laid upon the statements: "Tired and run down feeling," "bowels very sluggish; takes laxatives every night," "has some piles which cause not very much discomfort or

bleeding," "has occasional nocturia; about once or twice a night," "has a little touch of asthma, but seldom has colds or sore throats." But the report of the examination by the doctor does not show any of those conditions. It shows a sound heart. It is endorsed: "Tentative diagnosis: constipation with colitis." Dr. Mortesen testified that Arnold stated to him he had a pain in his back and a tired, run down feeling. He was not asked specifically whether he had made the other statements to him as recorded. The doctor pronounced his condition to have been temporary. He specifically testified that he did not know of his own knowledge whether or not Arnold was then suffering from piles or asthma or any disease of the heart, but he remembered to have looked for asthma and told him he had a little touch of it.

In contradiction, Arnold testified that the history of the case, to be distinguished from the examination, was based upon questions asked by a stenographer, as he remembered. He might have made the statements concerning his tired feeling and the taking of laxatives, but he says he was convinced at the sanitarium that he did not have constipation and need not take laxatives, and that he had not done so since that time. He denied having had piles, although perhaps had suffered a little discomfort. He had never had asthma, and can only account for the record by perhaps having a cold or congested condition in his chest and might have said that it acted like asthma. The report is discredited, for it shows Arnold to have artificial teeth, when such is not the case; a condition which could not be the subject of controversy.

Dr. O. W. Rash, Arnold's family physician for many years, testified Arnold had never consulted him for any of the ailments or conditions reflected by the record of the sanitarium; nocturia, asthma, piles, constipation, or colitis. He made the examination for this policy as representative of the appellant and found the applicant to be as represented, and recommended him because he was a good risk. Two of Arnold's business associates for many years testified that he had worked hard and his health had been excellent until he was stricken in 1931.

We now look to the opinion evidence. The vice president and the general medical director of the ap-

pellant testified to the reliance put upon the answers
in the application and medical examiner's report; that
much greater care is exercised by insurers in issuing
noncancelable health policies than ordinary life and
accident insurance and to the various conditions and
principles considered in passing upon an application;
that the practice is to require full and complete dis-
closure, and conditions are regarded material in this
kind of risk which would not be in other classes. Giv-
ing reasons why, these witnesses testified that, had the
facts appearing in the record of the sanitarium been
disclosed, the company, acting in accordance with the
general practice of insurers issuing this character of
policy, would never have issued it to Mr. Arnold.

On the issue of materiality of the representations,
the plaintiff introduced three witnesses. Dr. Spears,
of Louisville, who had been an examiner for insurance
companies for 25 years and who at the time was mak-
ing examinations for nine companies, two of which is-
sued noncancelable health policies, testified that, while
he had had no experience in an underwriter's office and
his work and opportunity for learning the prevailing
custom and practice of insurance companies general-
ly had been confined to the medical examinations, yet
he was familiar with that custom. He realized that,
in accepting a risk on a contract of this kind, greater
care and more particular attention is given to the med-
ical history. Nevertheless, upon consideration of a
hypothetical question presenting the claimed conditions,
the answers given in the application, and medical ex-
amination, the doctor expressed the opinion that Arn-
old would have been accepted even though complete
disclosure had been made; giving his reasons there-
for. Dr. Barr, of Owensboro, for some time had been
medical examiner for seven or eight companies, in-
cluding the appellant and two others which wrote in-
surance of this kind. Dr. Atherton, of Louisville,
was the medical director of the Income Life Insur-
ance Company of Louisville (which however, did not
write a noncancelable income policy), and was an ex-
aminer for several other companies. The evidence
of these two physicians is like that of Dr. Spears.

It is quite apparent that the conflict of evidence
raised an issue for the jury upon that phase of the law
as established by section 639 of the Statutes and our

decisions construing it, that if false representations in regard to a material matter (within the rule as to what constitutes a material fact) will, if relied upon, avoid the contract, even though not fraudulently made. Metropolitan Life Ins. Co. v. Hutson, 253 Ky. 635, 69 S. W. (2d) 742. This issue was submitted to the jury and in this particular the form of the instruction is not criticized.

■ We turn to the arguments that the defendant was entitled (1) to a peremptory instruction under the complementary rule that if the applicant for insurance knowingly and intentionally made misrepresentations, they are deemed fraudulent and will defeat recovery, regardless of their materialty to the assumption of the risk; or (2) to have had the instruction submit the issue of misrepresentations embodied in this defense. In both aspects of the rule of avoidance of liability, it must be remembered that we are dealing with representations, and not warranties, and that representations need not be literally true. It is sufficient if they are substantially true. United States Casualty Co. v. Campbell, 148 Ky. 554, 146 S. W. 1121; Security Life Ins. Co. of America v. Black's Adm'r, 190 Ky. 23, 226 S. W. 355; Globe Indemnity Co. v. Daviess, 243 Ky. 356, 47 S. W. (2d) 990, 991; John Hancock Mutual Life Ins. Co. v. De Witt, 259 Ky. 220, 82 S. W. (2d) 317.

The rule of innocence and materialty is based upon the idea that the insurer was induced to assume a bad risk, which it would not have done had the facts been disclosed. The rule of knowledge and immateriality rests on the idea of fraudulent representations causing deception, and the moral and legal philosophy that fraud vitiates a contract. The word "material" in this connection or association has the meaning of being such as would affect the determination of accepting or rejecting the applicant.

In the first phase of this combined rule of misrepresentation and consequent escape from liability, the jury and courts must regard the statements from the angle of vision or view of prevailing insurance economy and practice. In the second phase, the statements must be looked at from the standpoint of the ordinary, average man of honesty and integrity. This involves a consideration only of facts of everyday life,

of the motives of men living in the same community with members of the jury and of those ordinary physical and natural causes of which every man is presumed to have an understanding.

We are for the moment concerned with the second branch, fraudulent misrepresentation, the gist of which is the purpose to deceive and thereby procure the policy protection. It was commonly said in construing statutes providing that misrepresentations made in good faith should not avoid the policy unless material to the risk that an immaterial representation would avoid the policy if not made in good faith. Our statute was enacted to escape the rigor of common-law warranties. As it is written in Provident Savings Life Assurance Society v. Dees, 120 Ky. 285, 86 S. W. 522, 524, 27 Ky. Law Rep. 670:

> "The purpose of the statute was to prevent the insurer escaping liability on grounds having no real merit. To avoid the policy, the misrepresentation must be material or fraudulent. It was not the purpose of the statute to enable the insurer to avoid his liability by reason of immaterial misstatements. In the sense in which the statute uses the words, no misstatement is fraudulent which is immaterial. In other words, if the statement is substantially true it cannot be fraudulent. If the statement is not substantially true, then there is a material misstatement within the meaning of the statute. If the insured, when called upon to answer the questions, does not state substantially the truth, his statement is constructively fraudulent, if it is not fraudulent in fact. The word 'fraudulent' is added in the statute after the word 'material' to bring out this idea, and not to express the idea that the policy might be avoided by the misstatement of a fact wholly immaterial. The substance of the statute is that no misrepresentation, unless material or fraudulent, shall avoid the policy. It does not refer simply to a misstatement on a material subject; that is, on a subject material to the risk. It refers to material misstatements."

The word "material" as used in this connection means "substantial," "important," or "of consequence," as contradistinguished from "trivial" or

"minor." Where the element of knowledge and the factor of fraud are involved, as stated the point is a purpose to deceive and thereby procure the policy·protection. See, also, Blenke v. Citizens' Life Ins. Co., 145 Ky. 332, 140 S. W. 561; National Life & Accident Ins. Co. v. Fisher, 211 Ky. 12, 15, 276 S. W. 981; Metropolitan Ins. Co. v. Hutson, 253 Ky. 635, 69 S. W. (2d) 742. When we come to define what is a material or substantial misstatement in this relation, the answer would seem to be whether it was such that a man of honest intention and purpose would have made it, or would have willfully failed to disclose what he knew. So it is that to invalidate an insurance policy on the ground of fraudulent statements or representations, of falsity, knowledge, and immateriality to the risk, it is necessary to show facts from which an intention or purpose to deceive and defraud the insurance company can be reasonably deduced. Germania Insurance Co. v. Rudwig, 80 Ky. 223, 3 Ky. Law Rep. 712; Home Ins. Co. v. Stroud, 244 Ky. 315, 50 S. W. (2d) 934, 935; Metropolitan Life Ins. Co. v. McDonald, 246 Ky. 109, 54 S. W. (2d) 625; Citizens' Ins. Co. v. Whitley, 252 Ky. 360, 67 S. W. (2d) 488; Globe Indemnity Co. v. Daviess, supra. It is, therefore, by no means the law that every misstatement or concealment knowingly made will bring the case within the rule. Mutual Benefit Life Ins. Co. v. Daviess' Ex'r, 87 Ky. 541, 543, 9 S. W. 812, 10 Ky. Law Rep. 577; United States Health & Accident Ins. Co. v. Bennett's Adm'r, 105 S. W. 433, 32 Ky. Law Rep. 235; Ford v. Commonwealth Life Ins. Co., 252 Ky. 565, 67 S. W. (2d) 950, and cases cited there and in Couch's Cyc. of Ins. Law, sec. 831.

A misrepresentation willfully made under such circumstances and in such a way as is calculated to and does gain the confidence of the insurer and induce it to accept the application will avoid the policy even though not material to the risk. Thus, where the insured fraudulently represented that he was a wealthy man and thereby induced the insurer to assume the risk even though the statement was not material to the risk, it avoided the policy. But courts are not given to avoiding contracts for misrepresentation of an immaterial nature. The misrepresentations must have related to a fact which might reasonably have influenced the company in making the contract. So in Ætna Life Ins. Co. v. Claypool, 128 Ky. 43, 107 S. W. 325, 32 Ky.

Law Rep. 856, it was held that a statement by an apRep. 856, it was held that a statement by an applicant that his weekly earnings were more than they actually were was immaterial and no defense to an action for a lump sum for loss of a hand, although it might have been for weekly indemnity.

If the ailment or disability was of minor or temporary nature, or the subject-matter was so trivial and irrelevant to the applicant's present or reasonably anticipated condition of health, and such as could not have had any relation to, or bearing on, subsequent developments, there could be no reasonable inference or implication of fraud. To illustrate: A man had a doctor to dress a mashed thumb and some four years later stated in an application for insurance that he had not consulted a physician within the previous 5 years; and 12 years later he was stricken with a heart attack. Could any one in reason say he had made a misrepresentation with a fraudulent intent? Cf. Couch, sec. 885; Penn Mutual Life Ins. Co. v. Mechanics' Savings Bank & Trust Co. (C. C. A.) 72 F. 413, 432, 38 L. R. A. 33; Schofield's Adm'x v. Metropolitan Life Ins. Co., 79 Vt. 161, 64 A. 1107, 8 Ann. Cas. 1152; United States Health & Accident Ins. Co. v. Bennett's Adm'r, 105 S. W. 433, 32 Ky. Law Rep. 235; Penick v. Metropolitan Life Ins. Co., 220 Ky. 626, 295 S. W. 900. In the ordinary transactions of life, fairness and honesty are accepted and contracts generally are presumed to have been made in good faith until the contrary appears.

In actions involving fraud as in other cases where the facts present a double aspect, one consistent with fair dealing and the other involving dishonesty of purpose, the court, unless the scale decidedly predominates for the latter, will strike the balance in favor of honesty and innocence.

Disregarding the evidence of plaintiff and accepting that adduced by the company, we have (1) the fact that the insured for several years had visited a health resort for rest and vacation, and (2) a memorandum of his medical history. It is but the record made by some one who does not testify that Arnold 18 months before he applied for insurance admitted he had been previously treated for constipation, had sluggish bowels, requiring daily laxatives; a slight discomfort from piles, a little touch of asthma; a little pain in the back and a tired, run down feeling. The competency of this

record is exceedingly doubtful. See National Life & Accident Ins. Co. v. Cox, 174 Ky. 683, 192 S. W. 636. The doctor did not testify the record was correct. He stated he did not know whether or not Arnold was then suffering from the conditions described; that he remembered only that he found him with a little touch of asthma; and that his condition was temporary. The insured's testimony admitting some of these conditions and explaining or describing them may be considered also. In the light in which we must look at this evidence, we can see nothing that indicates a fraudulent misrepresentation in respect either of the specific answer concerning his physical condition or in saying he had not consulted a physician since childhood. We will not hold that because a man had gone to a health resort for rest and recreation periodically for years, or as a matter of precaution had had a physical examination which disclosed minor infirmities having no causal relation whatsoever to the condition arising 12 years later, he committed a fraud, or that it constituted sufficient evidence to be submitted to a jury on that point.

■ As we have said, the matter of materiality of representations to the assumption of the risk of insurance is to be measured by general insurance economy and practice. As this is not a matter or subject about which jurors are ordinarily informed, it permits, if not requires, a species of expert proof, i. e., of evidence of opinion of those informed on the subject. The materiality of a fact cannot be thus proved, but such witnesses may testify as to the usage and practices of insurance companies with reference to rejecting risks when they have knowledge of those facts. This evidence must be adduced by persons who are experienced in such transactions and familiar with the custom and practice. When thus qualified, they may express opinions as to the influence which certain facts would have with underwriters generally as an element in the contract, or whether insurance companies generally, acting reasonably in accordance with the usual custom and practice, would have taken the risk with knowledge of those facts. It is not competent to prove the practice of the defendant or what it alone would have done. Globe Indemnity Co. v. Daviess, supra; 11 R. C. L. 599; 14 R. C. L. 1022; 27 R. C. L. 185. The leading case on this point is Penn Mu-

tual Life Ins. Co. v. Mechanics' Savings Bank & Trust Co. (C. C. A.) 72 F. 413, 73 F. 653, 38 L. R. A. 33, in which Judge Taft reviewed the English and American cases and discussed the subject exhaustively. There is a decided conflict in the authorities. Couch, sec. 2192. Although this class of evidence is rejected in some if not a majority of jurisdictions (11 R. C. L. 599), the rule of admission prevails with us.

We hold that physicians who have acted for some time as medical examiners for insurance companies are qualified to express opinions as to whether or not in accordance with the custom usually prevailing among those engaged in that business the particular applicant would have been accepted if his representations had been substantially true. New York Life Ins. Co. v Long, 199 Ky. 133, 250 S. W. 812; New York Life Ins. Co. v. Long, 211 Ky. 656, 277 S. W. 978; Penick v. Metropolitan Life Ins. Co., 220 Ky. 626, 295 S. W. 900. In the case at bar, the plaintiff introduced three such physicians who testified that the facts forming alleged misrepresentations would not be regarded as material to the risk under the rule stated.

In the face of these consistent rulings as to the qualification of such witnesses, the appellant argues that these doctors were not qualified on this point, and, in substance and effect, say that only those who have had experience in considering or passing upon or accepting or rejecting applications for noncancelable income policies (like that involved) are competent. That contention was expressly rejected in Penick v. Metropolitan Life Ins. Co., supra. To sustain the point would practically deprive insured persons as litigants of ability to produce that kind of evidence in refutation of the opinions of those in the direct employment of insurance companies at their head offices, and upon whom, ordinarily, had rested the determination of acceptance.

█ The court refused to let the defendant prove that the insured, Arnold, during the entire period for which disability benefits were claimed, had been receiving a monthly salary of $600 from the company of which he continued to be president. The ruling was correct. He was one of the principal stockholders. It is submitted that this evidence was a circumstance tending to show that he lost "no business time," the con-

dition of indemnity, and was in fact employing his time rather than losing it. The only authority cited is a passing remark in Mutual Life Ins. Co. v. Dowdle, 189 Ark. 296, 71 S. W. (2d) 691. Concerning the probative value of such evidence, we have divergent syllogisms of respective counsel. We think it sufficient answer to appellant's argument that the policy did not indemnify the insured against loss of income or salary. It was against loss of time from his usual occupation. Cf. Fidelity & Casualty Co. v. Bynum, 221 Ky. 450, 298 S. W. 1080. In Globe Accident Ins. Co. v. Helwig, 13 Ind. App. 539, 41 N. E. 976, 977, 55 Am. St. Rep. 247, the policy insured "against the loss of the money value of his time." It was insisted there could be no recovery for disability because the insured had been paid his regular salary while disabled. We think the court very properly said:

> "If by reason of an injury insured against appellee actually lost the time from his business, he was entitled to recover the money value thereof up to $25 per week, even though his pay was continued during his disability. We can see no more reason in holding such payment to inure to appellant's benefit than there would be for refusing to one wrongfully injured by another the right to recover the value of medical services and nursing because gratuitously rendered. Evansville, etc., R. Co. v. Holcomb, 9 Ind. App. 198, 36 N. E. 39."

■ It is maintained by appellant that a peremptory instruction in its favor should have been given because Arnold's disability did not result in "continuous loss of business time" after August 8, 1932. This measure of disability is different from that commonly stipulated. We think a disease which necessitates continuous loss of time from one's business is equivalent to total disability or the loss of the capacity to work. For, if one is totally disabled to perform the duties of his business or usual occupation, within the meaning of an insurance contract, he must necessarily suffer total loss of time. If there be any difference, such a provision is more favorable to the insured than one merely indemnifying him for total disability. Certainly the term does not import permanency. Mutual Benefit Health & Accident Association v. Mathis, 169 Miss. 187, 142 So. 494; Workingmen's Mutual Protective As-

sociation v. Roos, 63 Ind. App. 18, 113 N. E. 760; Wall v. Continental Casualty Co., 111 Mo. App. 504, 86 S. W. 491; Bachman v. Travelers' Ins. Co., 78 N. H. 100, 97 A. 223; Baumister v. Continental Casualty Co., 124 Mo. App. 38, 101 S. W. 152; Couch's Cyc. of Insurance Law, Sections 1686-1688. In Pennington v. Pacific Mutual Life Ins. Co., 85 Iowa, 468, 52 N. W. 482, 483, 39 Am. St. Rep. 306, a policy issued by the appellant was involved, which provided weekly indemnity "for the immediate, continuous, and total loss of such business time as may result from such injuries." It was held that the "loss of such business time" had plain reference to the occupation of insured and no reference to the whole range of business pursuits. Recovery was adjudged, although the insured might have been able to do work of another kind or nature than that in which, he had been engaged.

Under that standard of measurement, the evidence is not only sufficient to authorize submission of the case to the jury and to sustain the verdict of incapacity during the entire period to the date of the trial, but if an adverse verdict had been returned, it is doubtful if it could have been sustained. The fact that since Mr. Arnold was stricken with a heart attack, he had not been in his store, or attended to any of its affairs, is undisputed. When he became able to leave his room about three months after he was stricken, he went to Florida and continued there in the winter, and then to Atlantic City and Battle Creek in the summer. He was in Owensboro upon two occasions for a short time; once in July and again in November, 1933. His evidence fully sustains the claim that he was unable to attend to business, and the evidence of his personal physician, Dr. Rash, and a heart specialist, Dr. Horine, is to the effect that at no time had he sufficiently recovered his health to return to work. Indeed, they say to have done so would have been fatal. While Dr. Horine observes that he could have gone to his office occasionally for a few hours and discussed business with his surbordinate officers and employees, and could have taken moderate exercise, except climbing stairs, provided he avoided mental excitement, worry and arguments, he expressed the opinion that Arnold was at no time able to transact his business. Both doctors had prescribed quiet and rest as the best remedy.

Over against this is the testimony of investigators of the company who had observed Mr. Arnold at his hotel in Florida and testified that he daily took short automobile rides, had done some fishing, had said that he had been out on his brother-in-law's sail boat; had walked several blocks on different occasions, and was seen to climb a stairway a few times. Arnold admits the rides and of having done a little fishing from a nearby pier, and once or twice, when the elevator was out of order, having gone to the back stairway to ascend to his room, since it was less steep than that in front of the hotel. The conclusions and opinions of the investigators that Arnold was simply obsessed with the idea that he was sick, and that there was apparently no physical impairment, also went into the record. The evidence of the investigator who observed him at Atlantic City was that he had taken long walks and spent his evenings listening to the music. At the instance of the company, Arnold was examined by its physicians in Atlantic City in July, 1932, in Florida in June, 1933, and in Owensboro, shortly before the trial. None of these doctors testified. The presumption is against the defendant.

The patient seems to have been doing just what his doctors advised, doing no work and avoiding exertion, exercising common care and prudence. Under his contract, the law did not require him to do work at the peril of his health or life if ordinary prudence required otherwise. This is a uniform interpretation. Ætna Life Ins., Co. v. McCullagh, 195 Ky. 136, 241 S. W. 836; Fidelity & Casualty Co. v. Bynum, supra; Home Protective Association v. Williams, 151 Ky. 146, 151 S. W. 361, Ann. Cas. 1915A, 260; Mutual Benefit Health & Accident Ass'n v. Burrow's Ex'x, 257 Ky. 808, 79 S. W. (2d) 222.

There are some other exceptions prosecuted from the rulings of the court, which have been given full consideration and found not to be meritorious.

The judgment is affirmed.