## T. M. Crutcher Laboratory et al. v. Crutcher et al.

Dec. 19, 1941.

Hal O. Williams and J. C. Cloyd for appellant.

Robert P. Hobson and George C. Burton for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

The suit below was instituted by the T. M. Crutcher Laboratory, hereafter called laboratory, by Kenneth Young a minority stockholder, suing for the corporation and in his own behalf as a stockholder. Young died dur-

ing litigation and suit was revived in the name of the administratrix. Defendants were Dr. Crutcher, T. M. Crutcher Dental Depot, referred to later as depot, and other laboratory stockholders.

The laboratory was incorporated in 1926, with an authorized stock of 250 shares of $100 par value. Dr. Crutcher held 126 shares, and Young, Probst, Armstrong and Barnett acquired about 30 shares each, Barnett later transferring 10 shares to Hoke, a brother-in-law of Dr. Crutcher. All the defendant stockholders were skilled, in manufacturing dental work. None of the minority stockholders paid cash; their holdings were paid for by bonus credits or dividends. It was charged that Dr. Crutcher had not paid a note executed for his stock, and owed the laboratory a considerable amount. These items will not be hereafter discussed, since the record shows these obligations were discharged, though after institution of suit.

The depot was also incorporated, its stock being held in major portion by Dr. Crutcher, with lesser holdings in the hands of his wife, and a kinsman. Dr. Crutcher was secretary-treasurer and manager of the laboratory. Probst was president, and they, with remaining stockholders, constituted the directorate, Young being one until some time in 1931, when he said he was "let out," of the corporation. Dr. Crutcher, owning a working majority of laboratory and depot stock, was in a position to exercise control over both, charged in the pleadings to be the fact, but about which no complaint seems to have been made for four or more years.

The laboratory was engaged principally in manufacturing sets of teeth, furnished to dentists and dental supply houses in all parts of the country, and did a thriving business. The depot furnished supplies and materials to dentists, and concerns engaged in the manufacture of plates, and through and from the depot the laboratory made the greater part of its purchases of materials and supplies, such as teeth, gold, rubber, resovin, etc.

The suit was instituted in April 1934, two years after Young had severed connection, and started a competing laboratory business. He alleged in the petition that during the period of business, up to the date of suit, the depot in selling supplies to the laboratory had

charged more therefor than would have been charged by other sources offering similar supplies; that the depot would buy supplies by direction of Dr. Crutcher, and bill them to the laboratory at prices greatly in excess of current market prices, the depot and Dr. Crutcher wrongfully turning the overcharges into their hands; that under this continuing plan of dealing, such excessive profits misappropriated by defendants would average $5,000 per year or a total of $30,000.

It was asserted that Dr. Crutcher had wrongfully taken the laboratory funds at times, and charged Laboratory's "general expenses" account with various sums, when no expenses existed, which from 1928 until suit, amounted to over $13,000; that in December 1931 Dr. Crutcher had caused an audit of the laboratory accounts, showing a profit of $10,586.50 for 1929, and $2,683.15 for 1931; no dividends had been declared, or surplus distributed, no payment of debts, and that no such sums "or material portion thereof" were in the treasury; "if" said sums were made by the laboratory they had been to the loss of the minority stockholders, applied to the use of Dr. Crutcher and the depot. It is alleged that the principal asset of the laboratory is the name of Dr. Crutcher, and that should the laboratory be dissolved the business would be worthless.

The pleadings and proof show that the laboratory executed a mortgage to the depot for $25,000 on personal property, equipment, etc., to secure the debt. It appears that the items named were of value of $2,500; the remainder was for good will, and from the proof this was of considerable value, since all agree that the laboratory was of high standing in the commercial world, and had a growing business.

It is alleged that the misdoings set out in the pleadings had been brought to the attention of the board of directors (assumedly of laboratory), and demand made that it require them by suit to account, but being under Dr. Crutcher's control the board refused such request. The pleading goes into details as to the stock transaction and alleges that 96 shares issued to, held and voted by Dr. Crutcher had not been paid for in money or equivalent. The chief point being that since these shares had not been paid for they should be cancelled, and all preceding meetings held void; that unless the stock be cancelled Dr. Crutcher will continue to exercise control

and dissipate the estate of the laboratory, to its irreparable injury, admitting his right to vote 30 shares of stock.

We shall dispose of this point at once. We note that there was neither prayer for nor mention of any temporary order. All injunctive relief was sought to be granted on final hearing, and the proof shows that before final hearing Dr. Crutcher had paid for stock, and other evidenced indebtedness to the laboratory.

The prayer of the petition sought accounting, and to have defendants return to the laboratory all monies wrongfully received; specific prayer is for $13,812.21, wrongfully withheld under item "general expenses"; for $30,000 wrongfully taken by way of excessive charges for materials, and $13,269.65 alleged profits for the years 1929 and 1931.

On May 23, 1934, answers were tendered on behalf of the laboratory, Dr. Crutcher individually, and the depot, each being a denial of the allegations of the petition. The cause was referred to the commissioner for hearing of proof, examination of records of the depot for the years 1927 to and including 1934; to find from evidence such amounts as might be due laboratory by reason of overcharges.

Defendants later filed an amended answer, alleging that transactions between the laboratory and the depot occurring in the years prior to April 16, 1929, were barred by limitation. Further, that in all its transactions with the depot, it furnished to the laboratory at the end of each month an itemized statement of all purchases made, and from time to time the laboratory settled on these statements, which during the years from 1926 to and including 1934, constituted accounts stated, in accordance with the true facts existing between the dealing parties, and relied and acted upon by both.

A reply controverted the allegations of the amended answer, and affirmatively plead that the facts complained of in the petition and amendment (which stated no cause of action) constituted a continuing, systematic and surreptitiously conducted plan to defraud plaintiffs and minority stockholders to deprive them of earnings, and that no cause of action accrued until the laboratory refused to sue defendants for an accounting, which refusal was within the statute of limitations.

It was further stated that they did not discover the "fraud complained of" until a time well within the 10 year period of limitations; that all matters pertaining to the fraudulent transactions relating to gold, teeth, resovin blanks and other materials, were discovered for the first time through the taking of evidence in 1934 or 1935, and plaintiffs could not have sooner discovered such fraud because Dr. Crutcher, having control of the records, denied access thereto.

A second amended petition was filed, as is said, to conform to proof, alleging that defendants charged laboratory for supplies (principally teeth) which were never delivered to laboratory, and "for which teeth defendants attempted to fraudulently take credit by wrongfully charging said teeth on the books of the depot as merchandise sold, but never delivered to laboratory." The same charge of lack of opportunity to ascertain the facts was made in respect of "general expenses."

Both parties asked for re-reference, and the commissioner was directed to take proof "on the issue of teeth sold and delivered to the laboratory during the period *1925* to and including 1934." In the commissioner's first report he detailed the pleadings and issues, and went to some length in giving a history of the organization and conduct of business of the two concerns.

Referring to statements filed by defendants, he found that from 1927 to and including 1934, the general expenses ran in various amounts, to a total for the eight years of $31,015.37. He found difficulty in working this item out, since there was intermingling of items which should have been placed under "supplies and materials," but due to absence of order slips could not tell whether certain items were delivered or not; complete verification could not be had in their absence. He thought Young's estimate of $600 per year for "expenses" was impressive, though not, perhaps, embracing all items shown in the account.

As we read the proof of Young on this point, it appears to have been no more than a guess. However, the commissioner disallowed this "general expense" item, and we dispose of this phase of the case by agreeing with the chancellor, who upheld the commissioner, concluding it was not vulnerable on the meager proof

of Young. This item is given no more than passing comment in appellant's brief.

The commissioner found from accountant's statement that with the exceptions of the years 1932-33, when there were losses to the extent of more than $10,000 net profits, to the total of $20,123.71, less dividends paid, $1,230, leaving total net profit of $18,896.71. Under the heading "overcharges" the commissioner took up the items year by year. This general heading included alleged overcharges on teeth, gold, resovin blanks, rubber and other materials, purchased from or through the depot.

The report showed that there had been supplies charged to but not received by the laboratory. It also included charges of amounts in toto for "bonus teeth," about which there was much dispute. It appeared that with the purchase of teeth from a certain manufacturer, if the total reached given quantities, the manufacturer would give the purchaser bonus teeth, and discount for prompt payment. There is a sharp dispute as to whether these bonus teeth were to be given on purchases for the whole year, or for purchases at any time in lots of $500 at any time. The laboratory claims that it being the purchaser was entitled to bonus teeth, but that after they were billed to it the depot would take them and credit the laboratory with the cost price, and rebill some of them to the laboratory at retail prices, retaining other sets.

In the recapitulation of overcharges commissioner took each year, and after deducting what he termed "general expenses," found the total for the involved years to be $19,407.69. This aggregate contained allowances for the total amount of difference in charges for supplies furnished by the depot at prices in excess of what some witnesses thought were proper charges for the same supplies in the open market. The commissioner reported that defendants were indebted to the laboratory in the sum of the two items, overcharges, and profits covering the whole period, and recommended joint and several judgments for the total.

The laboratory filed exceptions: (a) To denial of claim for advertisements paid for but omitted from "Oral Hygiene"; (b) disallowance of $31,015.68 for sums charged to "general expense" account. Defend-

ants excepted to so much of the report as (a) allowed $19,407.69 for profits of the corporation; (b) allowance for overcharges in any amount whatever on rubber, teeth, plaster, gold, resovin blanks, for the years 1927 to 1934, and non-delivered bonus teeth.

At a later date, after hearing additional proof chiefly on the submitted issue, the commissioner reported that nothing had developed to warrant a change in the former report. The defendants renewed their exceptions. Plaintiff renewed prior exceptions and excepted to disallowance for specific quantities of teeth charged for but not delivered.

The case was then submitted on exceptions. In a written opinion the chancellor remarked that he could not agree with the commissioner in any particular. He concluded first that the suit by the minority stockholder a "derivative action," could not be maintained or invoked to control the policies of a corporation against the will of a majority. Dealing with the question of "fraud" the chancellor apparently thought the plea of accounts stated in part was good.

> "When the laboratory needed supplies—from virgin gold to seasoned molar, it requisitioned the depot on signed order slips. Thirty days after billing, the depot retained the detailed bill as part of its permanent record; it destroyed the slips. Plaintiffs, after a lapse of years, undertook to restore the account from memory. To set this memory testimony up against permanent record is to my mind intolerable. While the matter was fresh; while the signed sales slips of the past thirty days were in existence, detailed inter-company account was rendered and accepted monthly. The account stated is conclusive as to quantity and price."

As to corporate earnings:

> "The laboratory has used its earnings to pay off stock subscriptions in favor of the subscribers, including plaintiff and his fellow craftsmen. It has been sparing in dividends, but has built up a surplus. The commissioner has recommended judgment against Dr. Crutcher and the depot for the surplus undisclosed in dividends. Neither the depot nor Crutcher got this surplus, it's still there where it ought to be in the laboratory."

In view of the fact that the laboratory, or plaintiff rather, insisted on not dissolving the concern, or placing it beyond its power to use and trade on the Crutcher name, it was not entitled to a judgment on the ground that the surplus, or the profits be divided among the stockholders. The chancellor found profits "still there," and we agree that there should have been no judgment on this score. As to expenses, or "general expense" account, the chancellor agreed with the commissioner as above stated.

The chancellor continued:

"In refusing to apply the statute of limitations the learned commissioner holds that a corporate director could not, with the exercise of diligence, find out that his concern was being consistently overcharged by its sole vendor of supplies used in its operation."

The chancellor did not agree, and later overruled all of plaintiffs' exceptions, sustained those of defendants, and directed a judgment dismissing the petition.

The commissioner properly found no liability either as against Crutcher for the charge of about $13 per page for advertisement in a trade paper, issued by Dr. Crutcher, called "Oral Hygiene." It seems that for five or six issues of the journal, the advertisement of laboratory's activities was carried under the name of "Crutcher Depot." Dr. Crutcher readily explained that he had failed to read the proof carefully, and the mistake was corrected in future issues. Young alone complained of this oversight, but apparently made no claim for credit until institution of his suit.

Appellant does not complain of disallowance, but mentions it as being a "side scheme," a straw which shows the direction of the wind. We pass this without further comment, as we did the "general expense" item, on the principle that matters not insisted upon in brief may be treated as waived. Helton v. Com., 245 Ky. 7, 53 S. W. (2d) 189.

There appears to us to be no necessity for a prolonged discussion of the right to maintain the suit. It was, as we read the chancellor's opinion, not pressed in the trial before him, and the point is not mentioned in appellees' brief. The rule of waiver applies with

equal force, and furthermore, since the record fails to show that the question was attempted to be raised either by dilatory plea or affirmative pleading, the question is not before us.

As we read the opinion of the chancellor, it seems clear to us that while he made reference to the pleas of "accounts stated" and limitations in an incidental manner, his final conclusion which resulted in sustaining "all of defendants'" and overruling "all of plaintiffs'" exceptions, and dismissing the petition, was based on matters of fact.

It is important to note that Young, in testifying, evidenced a feeble effort to see the depot's books. As we read the record, he only made one request for an inspection of the books, and then only for those of the years 1928 and 1929. He was refused he says, because Dr. Crutcher thought it would interfere with the bookkeeping. It further appears that this request was made after he had severed relations with the laboratory, and mayhap after he had started up competitive business, though he and Barnett had made prior complaints. Probst made no effort to inspect the books, he being too busy with his work, and says he would have had little knowledge as to their meaning or effect.

Plaintiff testified at length as did Probst, as to the manner of transactions between the two concerns. When the laboratory needed supplies from the depot it would make a requisition for such as were wanted. The order would be filled, and the person receiving the material would sign the order slip, keeping a duplicate. These slips served the purpose of allowing the bookkeeper to make daily entries on the purchase journal. At the end of each month, or at regular periods, the depot would render an account to the laboratory showing the supplies purchased, the price, and the balance due. In fact if we have examined the proper exhibits, this account was nothing more nor less than a carbon copy of the original sheet which went into the depot's books. While these are not shown for each and every year involved, the proof of the accountant, and of the one who had charge of the depot's books, show that this was the custom and practice for all years, and this is not denied.

It is shown that these slips, or some for years involved, were not to be found, and there is intimation of

destruction by one or the other parties for sinister purposes. The proof is not sufficient to justify us in confirming such belief. They were of importance, because Young admitted that it was "impossible for any one to check the books without those slips, and tell whether the books show the true condition or not," hence he and Probst, as said the chancellor, were compelled to rely on memory in an effort to overcome the showing made by the books over a long period of years.

The testimony of the chief witnesses is neither direct nor certain; Young's is perhaps more impressive than that of Probst, who apparently lacked deep interest in the outcome. Young was not at all definite as to whether certain supplies, chiefly teeth, had been charged for without delivery, or delivered and charged for at excessive prices. Bonus teeth, frequently referred to, present a rather perplexing situation. Whether they were the property of the laboratory or the depot is not clear; whether the depot took them from the laboratory and rebilled at excessive prices, or charged them without delivery, is uncertain. The books show one fact, and witnesses testifying from memory tend to show to the contrary.

The matter of overcharges for other materials is not at all satisfactorily established. Gold of less fineness might have been bought cheaper; rubber of inferior quality likewise; some such was bought, but returned at instance of Dr. Crutcher because of inferiority. The sale of resovin blanks was controlled by the depot; they could not be bought elsewhere, and these, with other supplies, were sold to other customers at the same prices with same discount, as manifested by proof and exhibits.

We need not carry this opinion to greater length, which could be readily done if we took up the various classes of items as detailed in reports and briefs; without such attempted extension, we conclude, after giving the briefs, the proof and entire record careful study and attention, that plaintiff has failed by sufficient proof to make a case entitling the minority stockholders of the laboratory to a joint or several judgment against the defendants. If Dr. Crutcher, and those associated with him, were unscrupulous, it took complaining minority stockholders a long time to develop the fact. In the ordinary transactions of business life and trade, fair-

ness and honesty are as a general rule accepted, and contracts are presumed to have been made in good faith, until the contrary is made to appear clearly.

"In actions involving fraud as in other cases where the facts present a double aspect, one consistent with fair dealing and the other involving dishonesty of purpose, the court, unless the scale decidedly predominates for the latter, will strike the balance in favor of honesty and innocence." Pacific Mut. L. Ins. Co. v. Arnold, 262 Ky. 267, 90 S. W. (2d) 44, 49.

The established rule in relation to the findings of a chancellor, sitting in equity, is that if from the developed testimony and circumstances in the case we entertain no more than a doubt as to the correctness of his conclusions, it becomes our duty to affirm. Having no doubt that the chancellor carefully considered the facts, and correctly determined the matter in controversy, the judgment is affirmed.