**COMPRESSED GAS CORPORATION, INC., Plaintiff–Appellee, Cross–Appellant,**

v.

**UNITED STATES STEEL CORPORATION and Jack B. Kelley, Inc., Defendants–Appellants, Cross–Appellees.**

Nos. 87–5535, 87–5608.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 2, 1988.

Decided Sept. 21, 1988.

John R. McCall (argued), Brown, Todd and Heyburn, Louisville, Ky., Robert Y. Gwin, Wayne Emery, USX Corp., Law Dept., Pittsburgh, Pa., for defendants-appellants, cross-appellees.

Grover Cox (argued), Louisville, Ky., for plaintiff-appellee, cross-appellant.

Before KEITH, KENNEDY and NELSON, Circuit Judges.

KEITH, Circuit Judge.

## I.

Defendants United States Steel Corporation ("USS") and Jack Kelley appeal, and plaintiff Compressed Gas Corporation ("CGC") cross-appeals, the jury verdict for plaintiff in this diversity action resulting from the explosion of a steel cylinder. The "3T" cylinder, manufactured by defendant USS and leased by defendant Jack B. Kelley, Inc., ("Kelley") ruptured while being filled with natural gas apparently containing certain contaminants. The explosion killed two persons, injured four others, and caused property damage. The personal injury and wrongful death claims were adjudicated in a separate lawsuit. At trial in this action, CGC claimed that it had been defrauded by the misrepresentations of USS and Kelley that the cylinders were safe for transporting natural gas and approved for that purpose by the United States Department of Transportation ("DOT"). CGC also made a products liability claim for a defective cylinder and failure to warn. This appeal focuses on the property damage resulting to plaintiff CGC from the rupture of the cylinder.

For the reasons set forth below, we believe the jury was improperly permitted to find against USS and Kelley on a theory of fraudulent misrepresentation, and was also improperly permitted to include CGC's alleged "lost profits" in the damages award. Because the jury reached a damages verdict that apparently was calculated upon a theory of fraudulent misrepresentation, and which also incorporated CGC's alleged lost profits, the verdict against the defendants must be vacated. We must therefore reverse on those issues and remand the entire case to the district court for a new trial. Further, we believe that an incorrect rate of interest was applied to the judgment below. We affirm on all of the remaining issues.

This case was tried as a summary jury trial on February 13, 1985, which resulted in a verdict of $200,000 against defendants USS and Kelley. The case was then reassigned to the Honorable Ronald Meredith of the Western District of Kentucky, who allowed additional discovery. A full trial on the merits took place on October 21, 1986. On December 11, 1986, the jury returned a verdict, apportioning fault at 70% against USS and 30% against Kelley, and awarding $1,766,271.20 in damages to CGC. The district court set the post-judgment interest rate at 12% to be compounded annually. The district court denied USS's and Kelley's motions for judgment notwithstanding the verdict and new trial.

Defendants USS and Kelley present a host of issues on appeal. They urge: 1) that the absence of proof of fraudulent misrepresentation entitled them to a directed verdict on the question of whether they fraudulently induced CGC to lease their steel cylinders; 2) that the jury instructions impermissibly allowed a solitary instruction on damages for two separate theories of liability; 3) that there was insufficient evidence to support a jury instruction on lost profits; 4) that Kentucky law requires the application of contributory rather than comparative negligence to products liability cases; 5) that the trial court abused its discretion in allowing CGC to conduct additional discovery following the summary jury trial; 6) that the trial court erred in applying the 12% post-judgment interest rate; and 7) that CGC's agreement to indemnify Kelley from all liability arising from the use of leased cylinder trailers entitled Kelley to a directed verdict on claims against him. On cross-appeal, CGC argues that punitive damages should have been submitted to the jury.

## II. FACTS

Gobel Mattingly, the retired owner of a highway construction company, incorporated CGC for the purpose of hauling natural gas from wells to commercial pipelines. A five-paragraph trade journal article describing the successful gas transportation operation of Texas Gas Transport ("Texas Gas") inspired Mattingly to enter the gas transportation business in August, 1976. When he incorporated CGC, Mattingly had no training or experience in gas transportation or compression. Joint Appendix at 927.

Mattingly visited Jack Kelley's Texas facilities to lease the special trailers that hauled the USS steel cylinders used in transporting natural gas. Kelley was one of four or five principal purchasers of USS seamless steel cylinders. He would purchase the cylinders from USS and fabricate trailers for them. Each trailer could transport twelve cylinders. As well as using the trailers to transport a variety of compressed gases, Kelley sold or leased the cylinder trailers to others. Mattingly executed a trailer lease with Kelley in February, 1977.

On October 27, 1977, CGC's compressor station was damaged when a 3T seamless steel cylinder manufactured by USS ruptured while being filled with natural gas apparently tainted by the contaminants hydrogen sulfide and water. CGC repaired its property damage for $45,307.54.

The experts who testified at trial generally agreed that the explosion of the steel cylinder would not have occurred if hydrogen sulfide and water had not combined with natural gas in the cylinder. Natural gas is odorless and flammable, and is composed principally of methane. Sometimes

natural gas, when extracted from the ground, contains contaminants such as hydrogen sulfide. Gas that does not contain significant hydrogen sulfide contamination is labeled "sweet" gas, while contaminated gas is called "sour" gas. In the gas industry, contaminated gas is considered dangerous because hydrogen sulfide in the presence of water will embrittle high-strength steel, causing it to fail under stress within hours. This is known in the industry as "sulfide stress cracking," and is recognized and understood. For sulfide stress cracking to occur, three factors must be present: hydrogen sulfide, water and susceptible metal. At the time of the accident, CGC had neither installed a dehydrator nor any sulfide removal equipment at its gas wells, unlike most other gas well operations in the United States.

When Mattingly and Kelley met to arrange the lease of the 3T cylinders and trailers, Kelley testified that he told Mattingly that Mattingly's "gas can't have any moisture in it or no hydrogen sulfide." Joint Appendix at 800. Kelley testified that he repeated this warning to Mattingly during Mattingly's second visit to his offices. Mattingly testified that "someone" had advised him that the gas had to be dry to be hauled safely in the 3T tubes, but he was not sure that that person was Kelley. *Id.* at 919. Mattingly saw a Kelley brochure which promoted the cylinder trailers, but never read the DOT regulations that were on the front of the brochure. In September, 1977, at CGC's request, Kelley sent Mattingly a copy of the DOT regulations setting forth the gases suitable for transport in 3T cylinders. Mattingly testified that again he did not read the regulations sent to him. *Id.* at 924.

Mattingly said that he showed Kelley an analysis of a gas well that indicated the gas was sweet. He did not, however, have the wells tested for hydrogen sulfide or moisture. *Id.* at 731. The test that he had showed Kelley was over a year old, and contained no moisture reading. Tests conducted on the wells following the accident revealed high concentrations of hydrogen sulfide and moisture. *Id.* at 615–16, 1043–45.

Aside from his three visits with Kelley, Mattingly's contacts with USS itself were scant. In September, 1976, while visiting the Kelley offices, Mattingly saw but did not read a USS brochure, and instead only "looked at the pictures." *Id.* at 924. In June of 1977, Mattingly saw an advertisement in the *Wall Street Journal* promoting USS cylinders for use in natural gas transportation. The advertisement gave no specific cylinder identification or detailed technical information, but gave a telephone number and invited inquiries from persons interested in further information. CGC never called the number in response to the advertisement.

Prior to the accident, neither USS nor Kelley ever had any complaints that, or knowledge that, any high pressure jumbo cylinder had ruptured in service. *Id.* at 983. As of the date of the accident, USS had produced over 15,000 jumbo steel cylinders. The 3T cylinder had transported approximately 48,000 loads of natural gas without difficulty. According to testimony at trial, never in USS's history had one of its cylinders ruptured in any kind of service until the explosion at issue here. *Id.*

## III. ANALYSIS

### A. *The Fraud Claims*

CGC claims that USS and Kelley fraudulently induced CGC to use the 3T cylinders by "misrepresenting" the cylinders as safe containers for natural gas transportation, and by misrepresenting that the DOT regulations authorized natural gas transportation in 3T cylinders.

Under Kentucky law, which governs this diversity action, the plaintiff must establish six elements to sustain a fraud claim. There must be: 1) a material misrepresentation, 2) which is false, 3) which was known to be false, or made recklessly, 4) made with inducement to be acted upon, 5) which is acted upon in reliance thereon, and 6) causes injury. *Wahba v. Don Corlett Motors, Inc.,* 573 S.W.2d 357, 359 (Ky. Ct.App.1978). Kentucky law also recognizes a presumption of innocence and hon-

esty against fraud claims. *Terrill v. Carpenter*, 143 F.Supp. 747, 753–54 (E.D.Ky. 1956), *aff'd*, 249 F.2d 142 (6th Cir.1957); *T.M. Crutcher Laboratory v. Crutcher*, 288 Ky. 709, 720, 157 S.W.2d 314, 319 (1941). The plaintiff bears the burden of proving fraud by clear and convincing evidence. *Brooks v. United Kentucky Bank*, 659 S.W.2d 213, 216 (Ky.Ct.App.1983); *Wahba*, 573 S.W.2d at 359; *Sanford Construction Co. v. S. & H. Contractors, Inc.*, 443 S.W.2d 227 (Ky.1969). Under Kentucky law, a motion for a judgment notwithstanding the verdict is subject to a "more than a scintilla" of evidence rule; that is, we will reverse the denial of a judgment notwithstanding the verdict if we do not find evidence of fraud of probative value having fitness to induce conviction in the minds of reasonable persons. *Wadkins' Adm'x v. Chesapeake & Ohio Railway Co.*, 298 S.W.2d 7, 9 (Ky.1956). We find that plaintiff has not presented "more than a scintilla of evidence" toward meeting his burden of proof.

1. *No Material Misrepresentation Known to be False or Made Recklessly.* CGC argues that USS and Kelley falsely represented that the steel tubes were safe for "natural gas." Indeed, the main dispute between the parties appears to center around their conflicting definitions of the term "natural gas." CGC apparently defines "natural gas" as that which is extracted from wells in its natural state, without dehydration or without removal of hydrogen sulfide. In other words, CGC's definition is that of untreated natural gas, which may contain certain amounts of the contaminants at issue in this action.

USS and Kelley, on the other hand, defined "natural gas" as that which is suitable for transport in their steel tubes—i.e., non-corrosive, dry and sweet gas, absent contaminants. This dry gas, they claim, is "essentially methane." Indeed, prior to the accident in this case, defendants claim, the DOT and the industry had apparently used the terms "natural gas" and "methane" interchangably. The evidence shows that USS and Kelley were reasonable in their belief that "natural gas" and "methane" could be considered at the time to be virtual equivalents.

Kelley's operation produced a brochure which specified that 3T cylinders were "approved for several gases including Methane." Joint Appendix at 467. Kelley sent a copy of the DOT regulations to Mattingly-regulations which specified that the tubes were authorized to carry methane; in the cover letter to those regulations, William C. George of Kelley's firm wrote that "Part 173.302, Sub 3, of the Code authorizes the transportation of methane (natural gas) in 3–T tubes." Joint Appendix at 496–97. Kelley painted "METHANE" on the side of the cylinder trailers in bold letters. In other words, Kelley's firm apparently used the terms interchangeably.

■ A less plausible interpretation of the same facts, and one that CGC would have us believe, is that Kelley somehow connived to make CGC think that methane and natural gas were one and the same, when he believed that this was not true. That version of events would have Kelley painting his trucks with the word "METHANE" even though he knew that they were to be used for transporting the less pure natural gas, and duping CGC into thinking that the DOT regulations were meant to cover natural gas as well as methane. The jury found CGC's story convincing, and we do not overturn their finding lightly. However, under Kentucky law, as we have stated above, there is a presumption of honesty against fraud claims. " 'In actions involving fraud ... where the facts present a double aspect, one consistent with fair dealing and the other involving dishonesty of purpose, the court, unless the scale decidedly predominates for the latter, will strike the balance in favor of honesty and innocence.' " *T.M. Crutcher Laboratory*, 157 S.W.2d at 319 (quoting *Pacific Mut. L. Ins. Co. v. Arnold*, 262 Ky. 267, 276, 90 S.W.2d 44, 49 (1935)). There was no evidence proffered of duplicitous behavior or intent to deceive on the part of Kelley or Kelley's operation. We find that Kelley's meshing of "natural gas" and "methane" was more consistent with his honest belief that the

terms were interchangeable than with any attempt to fraudulently conceal the truth.

■ The closest that plaintiff comes to proving fraud with respect to Kelley is the cover letter from Kelley's assistant traffic manager defining the two terms as one. A copy of the DOT regulations was sent to plaintiff with the letter. This representation, to the extent that it is a misrepresentation of law, is not actionable in Kentucky. *Fields v. Life & Casualty Co. of Tenn.*, 349 F.Supp. 612, 615 (E.D.Ky.1972); *Moseley v. Owensboro Municipal Housing Comm'n.*, 252 S.W.2d 880, 881 (Ky.1952). Moreover, Mattingly did not even read the letter.

USS also used the terms "methane" and "natural gas" interchangeably, according to Peter G. Fairchock, Chief Metallurgist at the Christy Park Plant of USS. Joint Appendix at 1002. More importantly, however, the DOT used the terms interchangeably on a shipping permit, which recited:

2. COMMODITY. Natural Gas.

3. PROPER SHIPPING NAME (49 CFR 172.5) Methane.

The DOT also recognized that the industry was using the terms interchangeably, and, after the accident, promulgated a clarification which distinguished natural gas from methane, a primary component of natural gas. 43 Fed.Reg. 13,382 (1978) (to be codified at 49 C.F.R. § 173.302(a)).

While it is fairly clear in retrospect that it would be irresponsible in 1988 to use "natural gas" when what is really meant is pure methane, at the time of the accident, this was not the practice. Thus, we believe that in 1977, USS and Kelley properly represented the DOT's regulations as they reasonably interpreted them.[1]

■ As to the misrepresentations specifically made by USS, CGC claims basically that an advertisement in the *Wall Street Journal* was sufficient to establish evidence of fraud. The advertisement generally promoted USS pressure cylinders for use in natural gas transportation. Joint Appendix at 535. The ad did not specifically identify any cylinders, and instead provided a telephone number to call for inquiries. CGC never contacted USS in response to the ad, and therefore received no representations about the cylinders. CGC also claims that USS misrepresented the use of the cylinders through a USS brochure that Mattingly saw in Kelley's offices. Yet, since he never read the brochure, Mattingly could not have gleaned any misrepresentations from it.

■ 2. *No Reliance.* More striking, however, than the paucity of evidence showing any material misrepresentation is the absence of evidence of reliance. The proof offered at trial simply does not establish that Mattingly relied on statements made by USS or Kelley. Rather, Mattingly testified that he never read the brochures by USS or Kelley, nor did he telephone USS in response to the advertisement in the *Wall Street Journal.* Indeed, that article appeared after he had already committed himself to his new business venture. As defendants indicate in their brief, from September 1976 to April 1977, Mattingly incorporated CGC, obtained various quotes on compressor equipment, negotiated with potential buyers of his gas, entered into lease agreements for 3T cylinder trailers from Kelley, executed a contract giving him rights to various gas wells to be used in his operation, began making improvements to the road leading to the compressor site and began laying pipes to transport the gas from the wellheads to the compressor site. The *Wall Street Journal* article appeared months later.

■ Mattingly claims that he used the article to obtain a loan for his business. Although it is possible that the Small Busi-

---

1. The only indication that the DOT did not intend to permit 3T cylinders for natural gas transport came from a "preface" to a comment in a 1973 issue of the *Federal Register,* 38 Fed. Reg. 21,989 (1973). This preface appeared prior to the DOT's issuing the shipping permit mentioned above permitting 3T cylinders in natural gas service, and prior to the Texas Gas operation. In addition, the preface never became part of the regulations and was not published in the C.F.R. Prior to the accident, USS had no knowledge of the preface. Joint Appendix at 985.

ness Administration may have relied on the advertisement in granting Mattingly the loan (and there was no proof of this), that does not establish that *Mattingly* relied on the advertisement in using the 3T cylinders. In fact, the lease agreement for the cylinders was signed and completed a full four months before the advertisement appeared. Whether the Small Business Administration used the advertisement to grant a loan is irrelevant to the claim that USS fraudulently misrepresented the use of 3T cylinders to Mattingly. Kentucky law requires that the party claiming fraud show that he or she relied on the alleged misrepresentation, not a third party. *Wilson v. Henry*, 340 S.W.2d 449, 451 (Ky. 1960).

Moreover, CGC never telephoned USS in response to the advertisement. It is difficult for us to imagine reliance on a fraudulent misrepresentation when the advertisement in question was non-specific, made no promises, and when CGC never even exhibited enough "reliance" on the ad to call the telephone number listed CGC cannot now allege that *if* they *had* called the number, they *would have* relied on some hypothetical USS statement about the propensities of natural gas. Hypotheticals do not constitute reliance. Even so, every person who testified about having spoken with USS regarding the use of 3T cylinders for natural gas transportation acknowledged that USS specified that 3T cylinders were suitable only for sweet, dry gas.

■ An examination of the brochures that CGC claims also induced reliance supports our conclusion. These brochures are presentations of the various uses to which "seamless pressure vessels" (USS cylinders) can be put. *See* Joint Appendix at 468–95; *id.* at 565–78. Even assuming that it would have been reasonable to rely exclusively on the descriptions contained in these brochures, there is no basis to rely on them for the proposition that it was safe to transport natural gas in 3T cylinders. Rather, the brochures, under the heading of "description," state that "USS Seamless Pressure Vessels offer great inherent strength and reliability in handling hydro-

gen, nitrogen, air, helium, oxygen, and other gases." *Id.* at 472 and 567. The same list is repeated under "typical applications." *Id.* at 477 and 569. Thus, even if the brochures are seen as intended to have induced reliance, they could not reasonably have been relied on to transport natural gas without further inquiry.

■ As further evidence of reliance, Mattingly asserts in his brief that after the explosion, USS and Kelley continued to assure him that 3T tubes were safe for transporting natural gas and that he should resume his business. *Id.* at 914–15. Under Kentucky law, CGC must show that its reliance on the misrepresentation was the cause of the injury. The damages claimed by CGC cannot be attributable to USS's alleged *post*-explosion misrepresentation. Since CGC never resumed business, CGC could not have relied on USS's alleged assurances. In short, we are unimpressed by the evidence of fraudulent misrepresentation. Plaintiff cannot surmount the first two important hurdles in the test to establish fraud: i.e., that there was a misrepresentation, and that there was reliance. We need proceed no further in our inquiry on the fraud issue.

We therefore reverse with respect to the claim that USS and Kelley fraudulently misrepresented the use of the 3T steel tubes, and remand the case back to the district court with instructions to proceed solely on a negligence theory of liability. We recognize that this decision necessarily affects USS's and Kelley's claim on appeal that the jury instructions given at trial improperly mingled the damages theories as to fraud and negligence. Since on remand the case will be tried only on a negligence theory, there will be no need for an instruction as to the legal theory of fraudulent misrepresentation. A single damages instruction would therefore be acceptable under this singular theory of liability.

### B. *Lost Profits Instruction*

■ The jury awarded CGC $1,137,154 in lost profits as a result of the cylinder explosion. Defendants USS and Kelley challenge the jury instruction on lost prof-

its, claiming that such damages in this case fail for lack of the required certainty under Kentucky law. We agree.

Kentucky law requires that CGC establish the fact of lost profits with reasonable certainty. *Pauline's Chicken Villa, Inc. v. KFC Corporation*, 701 S.W.2d 399, 401 (Ky.1985).[2] *See also Mitchell Coal Company v. United Mine Workers of America*, 313 F.2d 78 (6th Cir.1963), where this court held that the *Mitchell* plaintiff had not produced enough evidence of lost profits to take its claim to the jury. This court wrote:

> The [plaintiff] had been in business only a few months and had operated at a loss before the happening of the events complained of here. There was no showing that it could have operated at a profit. Even under the liberal rule in *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 the loss of profits must be established by at least a reasonable probability and not on sheer speculation and guesswork.

*Mitchell*, 313 F.2d at 79.

As defendants point out in their brief, CGC's claim for lost profits is speculative at best. The company was newly formed, in a relatively new industry, and dependant upon the unpredictable gas market at a time when there was an oil crisis. CGC operated only for a total of ten days and transported only eleven loads or partial loads of gas. It never made a profit. CGC had only one customer. Don Fowler, the president of Texas Gas, a gas transport operation 900 miles from CGC, testified that Texas Gas made little or no profit in its gas transport operation, Joint Appendix at 1066, 1078–80, and had never operated in Kentucky because it could not find gas wells of a quality and quantity sufficient to warrant the cost of establishing an opera-

tion. *Id.* at 1076. Thus, it would appear that CGC had little hope of making any profit, or of continuing in business at all.

CGC's proof of lost profits consisted of the testimony of Dr. Donald Monath, whose calculations were derived merely from subtracting CGC's estimated expense figures from the revenues CGC would realize if it operated at maximum capacity, 365 days a year for ten years. Monath concluded that CGC would have made $1,137,-154 over ten years. *Id.* at 964. He made no effort to determine whether CGC in fact could make a profit or could continue to operate in the area. He was not informed as to how CGC developed its cost estimates, how long the company had operated, the nature of the product, or the level of CGC management's experience. *Id.* at 945, 968–71, 975. It is apparent to us that these figures were far too speculative to permit an instruction on lost profits. We therefore reverse with respect to this issue as well, holding that the evidence on lost profits was insufficient to warrant submitting that issue to the jury.

## C. *Other Issues*

■ We assume, without deciding, that defendants did not waive the issue of the 12% post-judgment interest rate applied to their verdict by the district court. We believe that the district court incorrectly applied an interest rate in excess of the statutory mandate, and that on remand, the district court should be guided by 28 U.S.C. § 1961 in applying an interest rate to any verdict that may result from the new trial.

We have carefully reviewed the other claims on appeal and on cross-appeal, and are unable to conclude that they also constitute reversible error. We therefore affirm on the remaining issues.

---

**2.** The *Paulines* court set out in that case the facts that had removed "virtually all the uncertain variables":

> ■ This is a national franchisor, [2] with uniformity of national advertising, [3] uniform quality control, [4] earnings and expense figures on nearby and comparable locations, [5] and an available history concerning

> success and failure ratios. The franchisee, likewise, [6] is experienced in the field and with the specific product, with [7] a proven record of operation and management, [8] a history of profit and loss, [9] with two current operations in the general area, etc.

701 S.W.2d at 401–02.

Not one of these nine factors exists in this case.

## III. CONCLUSION

For the reasons set forth above, we RE-VERSE on the issues of fraudulent misrepresentation and lost profits, and REMAND the case back to the district court for a new trial, to proceed on a negligence theory of liability only. We instruct the district court to apply the proper interest rate to the damages verdict, if any, on remand. The jury verdict below is VACATED. We AFFIRM on all remaining issues.