## S. W. ANDERSON CO. v. GLENN, Collector of Internal Revenue.

### No. 43.

District Court, W. D. Kentucky, Owensboro.
Feb. 24, 1942.

John Bentley Anderson, of Owensboro, Ky., for plaintiff.

Eli H. Brown, III, U. S. Dist. Atty., and Malcolm P. Wallace, Asst. U. S. Atty., both of Louisville, Ky., for defendant.

SWINFORD, District Judge.

This is an action brought by the S. W. Anderson Company, a corporation, to recover certain income tax payments declared to be due and collected for the years of 1935 and 1936 under the Internal Revenue Act of 1934, 26 U.S.C.A. Int.Rev.Code, § 23, which reads as follows:

"In computing net income there shall be allowed as deductions: * * *

"All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *."

A deduction is claimed on a salary of $625 per month paid to James Ernest Arnold, president and general manager of the corporation. The defendant contends that the services for which he was alleged to have been paid were not "actually rendered" within the meaning of the statute.

The facts are briefly as follows. The S. W. Anderson Company is the largest or one of the two largest department stores in the City of Owensboro, a city of about 30,000 population. It had a capital stock of $100,000 and was in an extremely healthy condition financially, paying a dividend of thirty and thirty-five per cent respectively during the years in question. It had a surplus and undivided profits of $75,-000. The stock was owned entirely by the family and two employees. James Ernest Arnold became connected with the store in 1889 when it was relatively small. It was then owned entirely by S. W. Anderson, by whom Arnold was originally employed. Mr. Arnold married a daughter of S. W. Anderson, the founder of the business, and upon the death of Mr. Anderson in 1923, became president and general manager at an annual salary of $15,-000. In 1924 and from that time until 1931 the salary of Mr. Arnold was $12,500 per annum. He owned one third of the outstanding stock. The store had several large departments and continually engaged from seventy-five to one hundred employees.

Mr. Arnold was an exceptionally good business man and was very active in the management and operation of the store and in looking after its investments and incidental enterprises.

In 1931 he was stricken with angina pectoris, a heart disease, which made it necessary to abandon entirely his personal management of the store. From that time until his death he was away from the store and with the exception of intervals of a few weeks at a time away from Owensboro, visiting resorts at various parts of the country in an effort to regain his health. After about two months from the first attack he was not confined to his bed but was constantly mindful of his health and gave it the greatest care. He was able to be up and around, have callers, attend places of amusement, read, engage in correspondence and lead generally the normal life of an

individual suffering from a heart ailment forbidding exertion.

On July 25, 1936, Mr. Arnold was stricken with a cerebral hemorrhage and died in October of that year.

It is urged by the defendant that it was not possible for the salary of $625 per month paid Mr. Arnold to have been earned under the circumstances entailing his entire absence from the store and city and that this was a gratuity or bonus which cannot be allowed as salary earned.

With this view I cannot agree. The evidence is preponderant that daily, weekly and monthly reports were sent to Mr. Arnold. That he frequently interviewed heads of the departments of the store who on some occasions consulted with him for several days at a time about the affairs of the store. That he went to New York City on occasions to assist and advise in the buying of goods and was also in touch with the store by telephone and telegraph at frequent intervals when emergency required. Further than that, it is in evidence that at all of these times. he was mentally keen and alert and kept in touch with marketing conditions generally.

Arnold had been with the store for forty-five years. He had grown up with it. He had an intimate knowledge of its smallest details. No problem could hardly arise that had not come to him many times before. He was personally known to all the employees as an experienced and carefully observing manager and executive.

In my judgment a man like this is invaluable to a business. A business making sufficient returns to pay 30% on its stock could well afford to pay the salary paid for the sole purpose of letting the employees know that Arnold was still the head of the store and the daily, weekly and monthly reports were being sent to him for checking and his advice in making changes in personnel. They each knew what Arnold required and expected of them. A vigilant manager will have a vigilant clerk. He was well worth the salary paid him. His physical condition admitted of his supervision on the restricted basis outlined and the proof is abundant that he actually kept in daily contact with the affairs of the business until July 25, 1936.

Two physicians testified and both stated that Arnold was physically able to perform the services shown to have been performed by the lay witnesses. Dr. O. W. Rash, Mr. Arnold's regular physician, testified as follows:

"23. State whether or not his condition gradually improved? A. It did.

"24. Was his condition in 1935 and 1936 better than it had been theretofore? A. Very much better.

"25. Do you recall now, doctor, whether or not you had told or indicated to Mr. Arnold in the summer of 1936, or at any time in 1936, that he might look forward to returning to the store personally? A. I don't recall whether I did or not, but he was so much better, and he was given more liberties. As I say, I saw him only once in 1936.

"26. Have you got the date that you saw him in 1936? A. Yes.

"27. Was that May 1936? A. Yes, May 5, 1936.

"28. Doctor, evidence has been introduced in this action to the effect that after his illness beginning in September, 1931, and after the temporary rest period in bed, throughout that time and including the years 1935 and 1936, until he suffered a stroke in July 1936, that Mr. Arnold, whether in Owensboro, or Atlantic City, or New York, or Fort Pierce, every day he received official daily reports and every month he received the official monthly reports and every week he received the official weekly reports of the condition of the S. W. Anderson company; that in addition to that, he received daily, or almost daily, written communications—letters written him by Mr. Charlie Hamilton who was in charge of the store itself in his absence, concerning the business of the store; and he received a letter two or three times a week from Mr. Couty, who was Secretary and Treasurer at the store; and at less frequent intervals he received letters from other department heads and that if anything urgent would come up during that period, and especially in 1935 and 1936 to which I am referring, he would receive telephone calls and telegrams and, in addition to that, on an average of once monthly he would receive visits from the officers or department heads about the business of the store; that he usually saw them in Atlantic City on their way to New York on buying trips and frequently he was in New York with them supervising the buying, now, doctor, assuming these facts to be true, bearing in mind your own personal knowledge of Mr. Arnold's condition, and bearing in mind, further, that these busi-

ness matters were taken up with him away from the store itself, state whether or not in your opinion there was anything in Mr. Arnold's physical condition to keep him from performing those services? A. I don't think there was anything to prevent him from doing such service as that.

"29. Was there anything mentally wrong with Mr. Arnold? A. Nobody ever knew it if there was. He had a keen mind, gave quick decisions, and was usually right."

Dr. E. E. Herine, a well-known heart specialist of Louisville, in answer to the same hypothetical question stated:

"A. I think it would have been possible for him to have done that, although that was incurring a whole lot of work.

"26. Did his physical condition in any way affect his mental capacity for work of that sort? A. No.

"27. What was Mr. Arnold's mental condition? A. So far as I observed it was at all times keen and clear.

"28. What I want to know, doctor, is whether or not Mr. Arnold was capable, in spite of his condition, to perform services of the nature outlined above by consultations and written communications with the various officers of the store, all taking place at a distance from the store itself—as a matter, you might say, of remote control by Mr. Arnold—what was his condition? Was he able to perform work of that sort or not? A. He could have replied to letters and cables, and could have made decisions about his own business."

■ It should be noted that there was a material reduction in the salary of Mr. Arnold after he was stricken in 1931. At that time he was receiving $12,000 per annum and this was reduced periodically until it reached the salary in question, $7,500 per annum. This is purely a factual question. There is no case that lays down a rule of law applicable to all cases. The rule of law is stated in the statute and its wording is plain and unequivocal. After hearing and seeing the witnesses in person, noting their candor and attitude, I am convinced that their statements with reference to the watchfulness and helpfulness of Mr. Arnold during the years in question were substantially true. Conceding that their interest was to have the plaintiff succeed in this case and that they might with perfect honesty color their testimony in so far as it was possible in favor of the plaintiff, I cannot find either directly or by inference that the things these many witnesses testified to were not true and that they deliberately offered perjured testimony for the sake of this corporation's recovery of a relatively small sum of money. Having accepted these statements as substantially true there is abundance of proof that Mr. Arnold "actually" rendered valuable "services" to his company in 1935 and 1936 and that the sum paid him was in no wise more than he earned. The plaintiff has sustained the burden of proof.

There is an important question of evidence presented by the record in this case which if held competent might have great bearing, but even though held competent I do not believe in view of the narrow limits of its competency, if competent at all, would change my views.

The defendant offered the deposition of Mr. James Ernest Arnold, taken in another case. The plaintiff, at the trial, objected to its acceptance. The Court permitted it to be made a part of the record but reserved ruling on its competency until final submission.

The deposition came into being in this way. At the time he became ill in 1931, Mr. Arnold owned an insurance policy with the Pacific Mutual Life Insurance Company of California. The policy made certain allowances for total permanent disability. The company declined to accept Mr. Arnold's representation that he was totally and permanently disabled within the meaning of the terms of the policy. Mr. Arnold sued the insurance company. See Pacific Mutual Life Insurance Co. v. Arnold, 262 Ky. 267, 90 S.W.2d 44. Mr. Arnold's deposition (the one offered as evidence for the defendant in the case at bar) was taken in which he made the express and exact statement that he had rendered no services of any kind at the store or for the store since his first illness in 1931.

■ It must be admitted that Mr. Arnold's statement, especially if it could be considered as a statement against interest, would have considerable weight in determining whether or not he had rendered services to the store. It must also, however, be borne in mind that the action in which Mr. Arnold made the statement was a personal action brought by him to prove a fact within the rules of law governing insurance contracts. The action here is by a corporation for an entirely different purpose. Even though it should be admitted it

would be accepted as evidence only of the fact that he had rendered no services as were required to disqualify his recovery on the insurance policy. It is recognized that Kentucky has one of the most liberal rules in determining total permanent disability under disability clauses in insurance contracts. The evidence was incompetent and should have been and is now excluded.

In so far as this action is concerned the evidence is purely hearsay. There is no exception to the hearsay rule under which it can be admitted.

With knowledge of the contents of the deposition the Court might feel that to ignore it is to do violence to this particular case because of a rigid rule of law. That is not the case. The hearsay rule admits of many exceptions. To except in this case would be to almost entirely do away with one of the most important and long-recognized rules of evidence.

■ The rule governing the admission of testimony on former trials is well expressed in 10 R.C.L. Section 151, as follows: "In order to render the testimony of a deceased witness admissible on a second trial, it is generally agreed that there should be a substantial identity of parties, —the word "parties" as thus used comprehending privies in blood, in law, or in estate. Where the party against whom the evidence is to operate if admitted was not a party in the former proceeding, the testimony is not admissible. The reason for this is that the party against whom the evidence is offered did not have an opportunity to cross-examine the witness. Furthermore, as to one who was not a party to the prior proceeding the evidence is res inter alios acta. Nor is the evidence admissible where the person against whom it is to operate is the same but the other party is different."

In the Encyclopaedia of Evidence, Volume 6, page 448, it is said:

"The fact that the author of the hearsay statement is dead or cannot be found does not affect the rule.

"The hearsay rule applies as forcibly to statements in writing as it does to those verbally made. Nor is it at all material that the hearsay statement was made under oath or as part of a sworn deposition."

In support of this text is the following foot note:

"In Lent v. Shear, 160 N.Y. 462, 55 N.E. 2[4], the court said: 'Declarations made under oath do not differ in principle from declarations made without that sanction, and both come within the rule which excludes all hearsay evidence.'

" 'A voluntary affidavit [marine protest before notary public] ranks in equal grade with hearsay testimony in the scale of evidence.' Patterson v. Maryland Ins. Co., 3 Har. & J., Md., 71, 5 Am.Dec. 419.

"Depositions as Corroborating Evidence —The fact that the hearsay statements were part of a deposition and material as corroborative of other evidence does not alter the rule. Clopper v. Poland, 12 Neb. 69, 10 N.W. 538."

■ The Kentucky authorities abundantly support the rule that evidence taken in one case is not competent to be introduced in another case between different parties. See Arderry v. Commonwealth, 3 J.J.Marsh. 183, 26 Ky. 183; Rucker v. Hamilton, 3 Dana 36, 33 Ky. 36; Kerr v. Gibson, 8 Bush 129, 71 Ky. 129; Oliver v. Louisville & N. Railroad Co., 32 S.W. 759, 17 Ky.LawRep. 840; Wilson v. Wilson, 174 Ky. 771, 193 S.W. 7.

Counsel for the defendant urges that the case of John McElroy v. George Dunn, 3 Ky.Op. 146, is directly in point. See also John McElroy v. George Dunn, 5 Ky.Op. 112.

In that case McElroy sued George Dunn and one J. H. Allen on a note. George Dunn defended on the ground that he was surety on the note. The statutory period had elapsed and suretyship was an absolute defense.

McElroy contended that the credit on the note had been advanced to Allen and Dunn as partners. In order to establish the partnership McElroy offered a deposition of McElroy taken in a lawsuit in a Georgia court by George Dunn to establish that a partnership existed between J. H. Allen and George Dunn where the question of the identity of George Dunn (rather than a person by the name of W. F. Dunn) as being a partner of J. H. Allen was at issue. The appellate court admitted the deposition.

It is true that this is a case in which a deposition taken in another case was admitted in the subsequent case. It is seen however that George Dunn is a party in interest in each action. He was a party to the Georgia suit and he was a party to the later suit in Kentucky. Aside from this the principal emphasis of the Court of Ap-

peals is upon the fact that George Dunn on another occasion, in another suit, was seeking evidence to establish a fact which he now denies. No reference is made to the context of the deposition, but the competency is based, certainly for the principal reason, of showing that George Dunn by his actions was in a former suit seeking and offering proof of the partnership which he later denied. The case is of little value as an authority for the admission of the deposition of Arnold in the case at bar.

Since there is no proof of services since July 25, 1936, the plaintiff should have judgment in accordance with the prayer of the complaint only up to that date.

Proper findings of fact, conclusions of law and judgment in accordance with this opinion should be prepared by the attorneys for the plaintiff and submitted for approval.