## Maddox et al. v. Maddox et al.

(Decided Feb. 22, 1935.)

O. R. BRIGHT and LANDER BRIGHT for appellants.

B. S. GRANNIS for appellees.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

The appellants, S. R. Maddox et al., are several of the children and grandchildren of Abraham and Senia Maddox, who seek by this suit in equity to set aside the deed of conveyance made by Abraham Maddox of his farm in Fleming county, Ky., on June 17,

1931, to his youngest son, A. W. Maddox, upon the grounds of undue influence, lack of mental capacity, and that the deed was obtained without consideration.

Upon submission of the cause upon the issues joined by the pleadings and proof, the learned chancellor upheld the deed and dismissed the petition. This appeal results.

The facts and circumstances under which the attacked deed was executed, and out of which this suit arose, show that this aged and worthy couple, Abraham and his wife, Senia Maddox, were about the time of the execution of the deed in question, respectively, eighty and seventy-nine years of age, and that they had, during more than fifty years lived together in affectionate co-operation, industry, and thrift, whereby each earned and laid by a modest estate, from which they had liberally and helpfully from time to time made advancements to each of their three daughters and all but one of their seven sons, as they in turn would grow up, marry, and move away to establish their separate homes.

For the last twenty-five years, it appears that Abraham Maddox and his wife had lived together upon his 134-acre farm, situated in Fleming county, and that his wife, Senia Maddox, separately owned an adjoining tract of some 25 acres, upon which their youngest son, Arlie, and his family during these later years lived and worked as share croppers. In addition to these farms, some personal estate was owned by them.

It is further shown by the uncontradicted evidence that in November, 1921, the wife and mother, Senia Maddox, pursuant to what appears to have been an agreed understanding between herself and husband as to their disposition among their children of their separate estates, made her will, by which she gave her entire estate to her three daughters. Also, it is stated by some of the witnesses that her husband did also soon make his will pursuant to such claimed agreement, by which it is testified he devised his farm to their youngest son, A. W. (Arlie), and his personal estate in equal amounts to his sons. Later it also appears that this will having been revoked by him in May, 1931, shortly before the death of his wife on June 12 following, he went with her to Flemingsburg, where his

friend and banker, Charles E. Rhodes, prepared at his or their request a joint deed for them, by which they conveyed to his youngest son, the appellee Arlie Maddox, his 134-acre farm "in abeyance as an escrow, and at death of both the grantors shall be delivered and become binding on the date of the death of the last surviving grantor," which was left with his friend, Mr. Rhodes, for its later delivery to Arlie.

Some sixteen days after making this joint deed, on June 12, Senia Maddox died, was buried on the 14th (Sunday), and her will duly probated on the 15th (Monday) by her son S. R. Maddox, as executor, who it is shown was for such purpose taken to Flemingsburg, the county seat, by his brother-in-law, Ed Lowe (also the son-in-law of Abraham and Senia Maddox), who assisted him in qualifying as executor by going upon his bond as such. Lowe testifies that S. R. Maddox, when returning home with him, expressed his dissatisfaction with the way his parents had disposed of their property by their will and deed, as stated, and declared that it "could all be torn up." This statement made by S. R. Maddox to Lowe, whether meant only as an expression of his opinion as to the validity of their acts, or as an expression of his intention to "tear up" the criticized unsatisfactory disposition made by his parents of their property, was communicated by Lowe to his brother-in-law, Arlie Maddox, who admits that he at once repeated S. R.'s statement to his father. The evidence shows that the father was much hurt and perhaps angered by this report, received at this time when he was so much distressed over his wife's death, and that, when told of it, he remarked that he "would go to town and fix it so they couldn't tear up things." Also his resentment of his son's repeated threat was shown by the further remark that for his children "to try to tear up their mother's will would be like stealing from the dead."

The testimony of all the witnesses is to the effect that the old gentleman was at this time, when he had just lost his wife and companion of more than fifty years, "worried to death" and "greatly-depressed and upset over his wife's death," and that he declared "that he knew not what to do or who would take care of him." Under the influence of such conditions and his hurt and angry feeling over the reported threat

to "tear things up," immediately—upon his own initiative—he had his son-in-law, Ed Lowe, take him to Flemingsburg, where, after learning that he could recall and cancel the former joint escrow deed left with Mr. Rhodes, he had Mr. Rhodes write him another deed in lieu thereof, whereby, for the consideration therein recited, which was dictated by him, he conveyed his farm outright to his younger son, Arlie Maddox, which was at once delivered and recorded. In May, 1932, some eleven months after the execution of this deed, Abraham Maddox died. In the following July, this suit was by some seventeen of the children and grandchildren filed, attempting to set aside the deed upon the grounds alleged, that it was obtained by the grantee, Arlie Maddox, by undue influence, without consideration, and that it was executed by the father when lacking mental capacity.

The evidence shows that Arlie Maddox, to whom the farm was conveyed, had always lived, not with but nearby his parents, upon the farm lands either of his father or mother; also that he was a "weakly" man and had then been for some two years sick and practically confined to his home, unable to work; and that he had a family of eight children, ranging in age from seventeen to three, one of whom was then, and it was believed would continue to be, "a confirmed invalid."

Ed Lowe, the brother-in-law of Arlie Maddox, testifies that the old gentleman had given, as his reasons for giving by the joint deed a preference to his son Arlie, that he was "weakly," had a large family and a crippled child.

The father's fixed intention is by the evidence shown to have been for some years prior to his execution of the deed in question to give his farm to his "weakly" son, because of his needy condition, calling for his help. Such fixed intention is evidence both by the terms of his alleged earlier will and by his and his wife's later joint deed in escrow, as well as by this his last deed, which is here in question. These instruments were all (except the last) made by the father when he was living in his home with his wife and when it abundantly appears that he was in nowise under the influence or within the custody of this son, even though he was then living with his own family upon

the nearby back land of his mother or else on his father's farm.

Also, it is nowhere testified or claimed that the deed in question was made to his son Arlie under the inducement of even a hint, suggestion, or request from him or that he was in anywise influenced by Arlie to make him a deed to the farm. In fact, the evidence is all to the effect that even in his advanced age, the father was a man not easily swayed or influenced by the members of his family or any one. The testimony of his neighbors and all of his children, except one, is that the old gentleman had retained both his mental and physical vigor to an unusual degree, even up to the time of making the deed in question, and then possessed not only strong mental capacity but also retained a continued independence of will, clearly enabling him to dispose of his property according to a fixed wish and purpose of his own.

It is true one of his sons and also one of his friends, a veterinarian, testified that upon the day he made this deed, they thought he was so distressed and harassed of mind, due to the loss of his wife, as in their judgment to be unable to then make a contract.

Such is the evidence as to the father's mental capacity and independence of will showing it clearly adequate to dispose of his property according to his own wish and purpose. Neither is there any evidence that Arlie, his son, or any one had either been able or had attempted to exercise an undue or other directing influence over his mind or will.

We have, however, thought it helpful to give the real family picture, drawn by the summarized evidence, showing the living conditions and surroundings of the old gentleman, Abraham Maddox, which appellants claimed were potent to influence him at the time of executing the involved deed to the appellee, his youngest son.

The appellants insist the evidence shows that their brother, Arlie Maddox, had always continued to live on the farm, near his aged parents, and that by reason of the long and close association with them, he had grown in their affections to such an extent that he thereby gained an undue influence and control over them. Appellants contend that even if they have failed

to show that such wrongful ascendancy in influence and affection was gained by Arlie over his father, at least Arlie's continued close and confidential relationship, created by such long and intimate association with his father and mother, afforded him an opportunity to exercise an undue influence over his father, which in itself was sufficient to impose upon him the burden of showing that the father's deed to him was not obtained through undue influence, but that his conveyance was voluntarily entered into by him and was devoid of inequitable incidents. Also they rely upon the circumstance that the last deed was made to Arlie when the old man was hurt and angry, and made so because of the information, which, they argue, was purposely given him by Arlie to unduly influence him, that his brother S. R. Maddox had stated that he could or was intending to "tear up the old lady's will" and the deed which they had made and put in escrow. It is not contended, however, that Arlie—whatever his motive—did more than truthfully repeat to his father the statement admittedly made by his brother to such effect. If it prejudiced his father against S. R., his son, such effect followed as the result of S. R.'s own words, and was not caused by any misrepresentation of him, and, if hurtful to his interest in his parents' estate, it was yet but a case of the hurtful reaction of his own words and conduct.

This brother, while admitting the statement and that his father had liberally given him nearly $1,200 from his small estate, can hardly complain of the effect of his deemed unfilial threat which so incensed his wounded parent as to cause him to at once ask that he be taken to town, where he "would fix it so none of them could tear it up." Clearly, the influence moving the father to at once make a deed to his youngest son, excluding S. R. and the others, may well be regarded as one that was exerted upon his father by what he considered as his son's ungrateful threat to thwart his mother's and father's desired disposition of their property, rather than to attribute his act in making the deed to Arlie as motivated by the latter's undue influence over him. We have no disposition to in anywise here abridge the rule often announced by this court, that the law looks with suspicion upon a transaction between persons sustaining confidential relations to-

wards each other, as imposing the burden on the person receiving property under such circumstances to establish that the transaction was one freely and voluntarily entered into, and that it was fair and equitable, and that the one making the conveyance was mentally competent to understand the nature of the transaction. Briscoe v. Briscoe, 225 Ky. 804, 10 S. W. (2d) 294; Davidson v. Davidson, 180 Ky. 190, 202 S. W. 493; Kelly v. Fields, 167 Ky. 796, 181 S. W. 657; Smith v. Snowden, 96 Ky. 32, 27 S. W. 855, 16 Ky. Law Rep. 353; Shacklette v. Goodall, 151 Ky. 20, 151 S. W. 23; Howell v. Howell's Adm'r, 189 Ky. 556, 225 S. W. 477; Roberts v. Parsons, 195 Ky. 274, 242 S. W. 594; Watson v. Watson, 190 Ky. 270, 227 S. W. 270; Thompson v. Thompson, 209 Ky. 677, 273 S. W. 522; Price v. Meade, 182 Ky. 814, 207 S. W. 695, 697.

While we have no desire to depart from the salutary principles announced in these cases, there is upon the evidence here before us only the question as to whether it is such as to bring the appellee within the operation of these announced principles as to the burden of proof and also that as to whether, if he is thereby found to come within the requirement of the rule, he has met such burden of proof by the evidence adduced.

The evidence is uncontradicted that the father continued to himself look after his own business, and to rely upon himself and his own energy and faculties for the control and management of it, until even after the time of making the deed here in question to his son, and in fact it clearly shows that his physical vigor and strength were also such, even when so advanced in years, as to be still able to well and independently of help look after it. Also, it is to be noted that while he lived for nearly a year after his making and the recording the deed here attacked, none of the appellants during his lifetime, or while he was on hand and able to face them and demonstrate to court or jury his personal capacity and freedom from coercion or undue influence, chose to raise the question either of his then mental capacity to make the deed or of his having voluntarily and according to his own fixed purpose executed it.

In the case of Lakes v. Lakes, 222 Ky. 411, 300

S. W. 859, 860, the court, in discussing a somewhat similar situation, said:

"The parties in this case did not reside together, nor was it anywhere proven that defendants in any manner exercised custody over the person of the grantor or any control over him. The only fact appearing in the record, and which also frequently appears where confidential relationship is involved, was the one that the parties were father and son. * * *"

And it further emphasized the fact that:

"The grantor lived for more than two years after the deed was executed, and neither he nor any relation of his suggested any objections to its execution, based upon either of the grounds relied on herein."

The evidence shows that no confidential relationship was reposed by the father in Arlie, that he did not depend on him to either advise him or to look after his business, and that only because of his being "weakly" and in need was his father influenced and disposed to preferentially help him, as had long been his intention.

Neither is it sufficient under the rule announced to show that Arlie, the beneficiary of his father's deed, had been given by reason of his living near him an opportunity to unduly influence him. For appellants to prevail, they must show by cogent evidence that Arlie both had such opportunity and did in fact fraudulently exercise it and thereby obtained the complained of conveyance to him.

Such is the rule, as was again thus announced in Applegate's Adm'r v. Jones, 220 Ky. 205, 294 S. W. 1032, 1033, where in discussing this question we said:

"The evidence of the witnesses for appellants on the question of undue influence show nothing more than an opportunity on the part of the appellee to exercise undue influence. This is not sufficient on that branch of the case to justify any court in holding that the undue influence which might have been exercised was actually exercised. It is never sufficient in such a case to undo what the decedent did on the grounds of undue influence if the testimony shows no more than that there

were opportunities that decedent might have been unduly influenced, or that it was possible that such influence was exercised. It is always necessary in such a case to adduce evidence showing that such influence was actually exercised. Crump et al. v. Chenault, 154 Ky. 187, 156 S. W. 1053; Childers' Executrix v. Cartwright, 136 Ky. 498, 124 S. W. 804. Evidence of undue influence must be substantial and not vague, uncertain, or irrelevant matter which does not carry the quality of proof or is not of such a character as to induce conviction. Clark et al. v. Young's Ex'x, 146 Ky. 377, 142 S. W. 1032; Brent v. Fleming, 165 Ky. 356, 176 S. W. 1134. There is nothing in this record to show that Stephen Applegate was easily controlled or that it was easy to get him to part with his money, but the evidence is rather to the contrary. Stephen Applegate executed this deed ten months before his death, and there is no evidence that he at any time expressed a desire thereafter to make any change in the disposition of his property. It is true he was old, but the testimony does not show that he was unable to express his wishes or that he did not know what he was doing, and the fact that he showed no indication that he regretted what he had done is a circumstance in favor of the validity of the transaction. Bradford's Adm'r et al. v. Kinney, 216 Ky. 348, 287 S. W. 921.

"* * * Old men have wisdom that the young know not of. Let it not be written by this court, therefore, that age always dries up the fountains of the mind and destroys the Godlike attributes of man.''

The evidence heard in the instant case by the chancellor as to Abraham Maddox's mental capacity preponderates most heavily, in support of the chancellor's finding that at the time of making the involved deed he did so both voluntarily and with a clear understanding of his act and according to a fixed purpose in so doing and that not one of those who here now otherwise claim were ever willing to assert his lack of capacity while he was living to defend his act.

Appellants further contend that the deed's recital as to the consideration received for the farm by the

father from his son was both erroneous and false and that the deed for such reason also, was vitiated and should be set aside.

A sufficient answer to this argument is that the aged father himself dictated the statement of the consideration acknowledged received, including that of love and affection, for which he was conveying his own lands to his own son, so it is clear that he was not deceived as to the adequacy of the recited consideration he was accepting therefor, or that the land was fraudulently procured from him through the recitals made, even if not in harmony with appellant's views as to the accuracy of the recital or as to what was the proper amount of his obligation owing the son Arlie for services rendered him. The father clearly realized what he was doing and was shown to have both planned and intended to convey his son the land for the consideration recited by him, as being an equalization of this son as for services long rendered by him upon the farm. The actual value and amount of this consideration recited by the father is here of no importance, if he was then mentally capable of understanding and comprehending his act in deeding his son the land, and, when uninfluenced by the son, voluntarily did so. He was the owner of the land and had a right to accept what consideration he wished for his property conveyed his son, in the exercise of his own volition to do so.

Having carefully considered all the evidence adduced by the appellants and the contentions urged respecting it, we are of the opinion that the appellants have failed to show either mental incapacity on the part of the testator or undue influence exerted over him, and that the chancellor was well within his right, when taking into consideration all the facts and circumstances thus shown, in arriving at the conclusion that Maddox's execution of the deed was his free and voluntary act, done at a time when he was competent to execute it, and that for such reason the attacked deed is valid. We therefore entertain no doubt as to the propriety of the chancellor's conclusion reached that the deed should be upheld and dismissing the petition. Therefore, the judgment is affirmed.