## Rucker v. Rucker et al.
### (Decided March 11, 1938.)

HECTOR JOHNSON for appellant.

J. R. LLEWELLYN for appellees.

OPINION OF THE COURT BY CHIEF JUSTICE STITES—Reversing.

This suit was filed by appellees, Schuyler Rucker and Rosa Oliver, against the appellant, William Rucker, to cancel a deed made July 28, 1931, by Martin Rucker, deceased, to appellant. Martin Rucker undertook to convey 100 acres of land and certain timber to appellant "in consideration of One Hundred ($100.00) Dollars in hand paid and for the further consideration that the second party is to care for, feed and clothe the first party as long as said first party lives." It is claimed that Martin Rucker did not have mental capacity to make the deed and that he was unduly influenced by his son, the appellant.

The proof indicates that the father of Martin Rucker lived on a tract of some 400 acres and that the tract here involved was inherited by Martin Rucker as his share of his father's estate. After the death of his

wife, Martin Rucker went to live with his mother, the grandmother of the parties to the present suit. Thereafter the appellant, William Rucker, and his wife moved in with Martin Rucker. We gather that the grandmother was still living at the time that appellant and his wife moved in. This was some five or six years prior to the death of Martin Rucker in September, 1933. The deed here in question was executed about two years before Martin Rucker's death and was immediately put to record, although it is asserted that appellees knew nothing of it until after their father died. It is not contended that appellant did not farm the land and feed and clothe his father after the deed was made. Some attempt was made to show that the $100 cash consideration was not paid by testimony to the effect that no one had seen Martin Rucker with $100 or had heard of his spending that much money after the deed was executed. On the other hand, appellant himself testified that the $100 paid was received by him as part of his bonus money for service in the World War, and another witness testified that he was present when the money was handed over to Martin Rucker. No exceptions were filed to the testimony of any of the witnesses, and the only questions argued relate to the sufficiency of the proof to show mental incapacity and undue influence. The chancellor canceled the deed, and we are confronted with the duty of re-examining the evidence to determine the propriety of his conclusion.

At the outset it may be noted that one of the items relied on by appellees to indicate Martin Rucker's lack of capacity is the fact that he is claimed to have had a stroke of paralysis or "something like a stroke" several years before this deed was executed. The witnesses who testified to this fact for appellees based their testimony expressly on the statement of the doctor who treated him at the time as to the nature of his trouble. Appellant introduced the doctor who stated that Martin Rucker did not have a stroke of paralysis, but at the time referred to he treated him for kidney trouble. The doctor further denied having stated that Mr. Rucker had a stroke. Under these circumstances, we may eliminate so much of the testimony for appellees as is based on the theory that decedent had suffered from paralysis.

Appellee Schuyler Rucker testified that his father "didn't have any recollections of anything, had no

judgment of trading'' and ''at times he wouldn't talk.'' He further testified, however, that he joined in a deed of partition with his father and appellant and apparently does not seem to think that his father lacked capacity to sign the partition deed. On cross-examination he admitted that at the time when his father signed the deed of partition his mind was ''like it had been all the time.'' Appellee Rosa Oliver testified that her father's mind was bad after he had the alleged paralytic stroke. She said that he could not count money and that his memory was bad and he ''would get off to himself and wouldn't talk with us.'' She says that her grandmother always did his trading, that ''he was just like a little child, Pa was, he could be persuaded into anything.'' She had never persuaded him to do anything, nor did she know of any instance of Willie Rucker or Schuyler Rucker influencing him, but she had ''heard grandmother tell him what was the right thing to do and he would mind her.'' Her father could not read or write and she had heard him say he could not learn. Her father worked, but it was her grandmother who did the managing.

James Wilson, a nephew of Martin Rucker, testified that Mr. Rucker never did any business without being advised and that he was not mentally capable of doing any business or taking care of his property rights. ''I don't mean to say he was a regular lunatic. He never had a mind of transacting business, he had no recollection of nothing.'' ''He couldn't count money, I have tried him, he couldn't count it correct.'' Seventeen or eighteen years ago witness bought two little pigs from him. He was asked:

''Was he able to take care of himself in that trade?''

He responded:

''Well, I got the pigs under their worth, of course.''

Tilford Pearson testified that ''He just about knew enough to go to the field and work by having a leader. He was a fine old gentleman in his way. And when the hogs needed slopping and when he was told he would get up right then, he just wasn't a bright minded man.'' He was a good man to pull the other end of a saw. ''My best opinion is he wasn't capable of doing no kind of trading or no kind of business, any kind of business.''

Lola Stewart testified that she was a niece of the decedent and lived on the same tract of land with him up until the time when she was married. Asked if she noticed anything wrong with his mind, she answered:

"Well, if any of us grandchildren couldn't go to the store we had to send him and when he took eggs he couldn't tell how much a dozen he got for them when he got back."

He had a mind "like a child about eight or ten years of age." "He never was capable of trading."

S. L. Stewart testified that decedent did not have as good a mind after the alleged paralytic 'stroke as he did before. He was never competent to transact business. "It just seemed as though he had a child's mind instead of a grown person's."

Nettie Rucker testified that she married Martin Rucker's brother. She had taught school for a year before she was married. "After I was married Mr. Rucker told me if I would learn Martin to read and write he would pay me for it but I didn't have any luck with him I couldn't teach him, he couldn't remember. I tried to teach him the alphabet. I tried to teach him to write, would set copies for him and he would make by them but I never could get him to know what they were." Martin Rucker had a mind like a child's and "he did just what somebody else told him." "His mother raised the children he was only there and helped to nurse them, and the estate left he heired it." "He worked some, he helped his mother about the house such as churning, keeping stove wood and probably went to the fields and worked some there by having a leader."

William Rucker testified that he was a brother of Martin Rucker. Martin Rucker went to school, but somehow or other he could not learn. "He would always ask mother for advice on everything." Willie, the appellant, "had all control after mother died."

Hector Johnson testified that he was in the office of the county court clerk at the time when Martin Rucker and appellant came in and that he prepared the deed here in controversy. Willie Rucker did most of the talking. On cross-examination he testified that he had known Martin Rucker for some fourteen years and that he had noticed no difference in his mental condition during that period.

"I was not very much associated with Mr. Rucker but my observation of him was this, He was a very nice looking man. When I first saw him he was a very strong looking man, looked to be about six feet tall, very quiet turned, and worked a great deal. He was clever at his home, and treated me nice when I was there, and it looked like they were very well to do people. And when I saw Mr. Rucker for the last time in 1931 he looked older than he did when I first saw him, and as to his mental condition he appeared to be about the same as he always was."

The foregoing was all of the evidence introduced in chief by appellee.

Willie Rucker testified for himself concerning the transaction. He says that his father made him the proposition to move in with him and keep him as long as he lived and pay him $100 and that he would make him a deed. His father did all of his own trading and witness never heard him ask anybody about making a trade. He went to the store and did his own trading. His father did light work on the farm after the deed in question was made. He was not able to work much because his legs would give out. "He had as good a mind as any man of his age, as I ever saw and he did his trading." He had never heard any one claim or contend that his father "only had a mind of a child until after he died."

Vess Evans testified that he thought decedent's mind was all right. "I never heard of anyone claiming that his mind was bad until they got up this suit, never heard of nobody saying he was crazy." "I never knowed of anybody giving him advice in his trading around and if they did it was unbeknowing to me." Witness had bought sweet potatoes from Mr. Rucker and paid the same price that he had paid to other people.

Sherman Hisel testified that he was appellant's brother-in-law. He was frequently at the home of Martin Rucker. He saw him working on the farm, and he managed his farm and took care of his live stock himself. He never heard any one claim that Martin Rucker was incompetent until this suit was filed. He saw Willie Rucker pay Martin Rucker the $100 consideration mentioned in the deed. Martin Rucker said:

"I am ready to make you the deed any time you get ready."

Curt Hisel testified that he always found Mr. Rucker to have sufficient intelligence to manage his affairs and to take care of himself in dealing with other people. He never heard any one tell him what to do or how to do it. He had worked for decedent hoeing corn, and was paid 75 cents per day. He never heard any one tell decedent how much to pay him. He bought a cow and a heifer from decedent, and no one in his presence told decedent how to price them. Witness cannot read or write, but did not think that this fact rendered him incompetent to manage his affairs. He never heard any one claim that Martin Rucker was incompetent until after this suit was filed.

Dr. J. B. Settle, whose testimony is referred to above in connection with the alleged stroke of paralysis, stated that he had known decedent for about twenty years and that at the times when he was with him his mind was rational on any subject. He never observed anything wrong with the condition of his mind. He could find nothing wrong with Mr. Rucker's mind, although he (Mr. Rucker) was a man of few words.

Louis Jones testified that he had known Martin Rucker all his life and that Rucker was as good a citizen as there was in the county. He had "bought potatoes of him and tried to trade with him, but we couldn't get together, he was a close trader."

Ebb Rose testified that Mr. Rucker was a successful farmer and managed the work of the farm himself and that, in his opinion, he had sufficient intelligence to manage his affairs. "He was just as fine a citizen as there was in the county."

E. E. Durham testified that he was a surveyor and farmer. He took decedent's acknowledgment to some deeds and made a survey of his property and took his list as assessor. The purpose of the survey was to make a division of the land between Martin Rucker, Schuyler Rucker, and Willie Rucker. Martin Rucker assisted in making the survey and made suggestions about where to run the lines and things like that. Witness thought that Martin Rucker had a normal mind.

In rebuttal, appellees introduced Dr. Alson Baker,

who testified that he had known Mr. Rucker and had seen and talked to him about a dozen times. "This man was what would have been called a high grade maron (sic) a man with the intelligence of the average child of twelve years old." Asked if decedent had sufficient mental capacity to take care of his property rights properly, he said:

"I would say no. Generally speaking, if there were any amount considerable amount involved I would say no."

He had never examined Mr. Rucker with a view to determine his mental capacity. He did not know his mental condition or mental capacity on July 24, 1931.

Following the introduction of Dr. Baker's testimony, appellees filed an amended petition, in which they alleged that decedent was non compos mentis from childhood.

At the outset it may be observed that the cancellation of an executed contract is the exertion of the most extraordinary power of a court of equity. It should be exercised only on strong and convincing evidence. Fields v. Cornett, 254 Ky. 35, 70 S. W. (2d) 954, and cases there cited. We have endeavored to give a full statement of the essential evidence. That introduced for appellees does not seem to us to be either strong or convincing. It is true that there is a direct conflict between the statements of the witnesses for appellees and those for appellant concerning many material points, but this mere conflict is not sufficient to bring us within the purview of the rule that we will follow the conclusion of the chancellor on a question of fact where on the whole case the mind is left in doubt. There are too many circumstances appearing in the record which detract from the convincing character of appellees' testimony and lend weight to that in favor of appellant for us to feel any doubt concerning the proper conclusion to be reached.

A large part of the evidence for appellees follows the hypothesis alleged in the petition that Mr. Rucker had a stroke or "something like a stroke" several years before this deed was executed. When it was demonstrated by the doctor who treated him that decedent did not have a stroke, appellees made no effort to contradict this testimony, but presented a complete change of

front and undertook to show that Mr. Rucker was non compos mentis from childhood.

Similarly, we find appellee Schuyler Rucker admitting that he accepted a deed from his father under the partition agreement and nowise disputing the testimony of the surveyor who prepared the partition deed and says that Mr. Rucker was active in that transaction. Appellee's actions in this particular hardly comport with his present position. If, as the surveyor says, Mr. Rucker went over the property with him and made intelligent suggestions about the running of lines and similar matters, this would certainly indicate that the decedent was not lacking in capacity. On the other hand, if this were not true, it would have been very easy for appellee to have contradicted it.

The testimony of Dr. Settle, who had known decedent for many years and had treated him on occasions, carries great force. He is positive in his assertion that he never observed anything wrong with the condition of Mr. Rucker's mind.

Appellees were compelled to go far into the past in their effort to produce facts to show mental incapacity, yet no step was ever taken to have decedent declared incompetent to manage his property during his lifetime. All of the witnesses agree that Mr. Rucker was taciturn. He may even have been dull. But we are not convinced from the evidence that he lacked capacity to make this deed. On the contrary, it seems to us that the testimony of the witnesses for appellant is more cogent and does not bear the inconsistencies apparent in the testimony for the appellees.

There was nothing unnatural in the bargain between appellant and his father, nothing unfair, nothing to indicate overreaching or fraud. It is true that Mr. Rucker died but two years after the deed was executed, and we may assume that the trade has therefore been a profitable one for appellant. It might easily have proved otherwise if decedent had lived, say, ten years longer. Parsley v. Parsley, 233 Ky. 42, 24 S. W. (2d) 931. It is insisted that the relationship between the parties was such as to place the burden on the appellant to show the absence of undue influence. If this were true, we should nevertheless feel no hesitancy in reversing this judgment. There is ample evidence to show

that the agreement was fairly made and that appellant was the one person with whom Mr. Rucker would be naturally apt to make such an agreement. The mere proof of the opportunity for the exercise of undue influence does not prove undue influence. Maddox v. Maddox, 258 Ky. 121, 79 S. W. (2d) 402; Chiles v. Major, 266 Ky. 594, 99 S. W. (2d) 761; McCutcheon v. Bichon, 267 Ky. 694, 103 S. W. (2d) 76. Every influence exercised over another is not "undue." The proof here indicates that appellant was the only one of the three children who saw much of Mr. Rucker and the only one who did anything for him. It will be readily observed that this was not a case like Bozarth v. Banister, 143 Ky. 476, 136 S. W. 902, which is heavily relied on by appellees. In that case the conveyance was not a natural one, while in this case it was. The conveyance in that case was practically a gift, while in the case at bar the appellant might well have been the loser in the transaction. The conditions surrounding the transaction in the Bozarth Case were almost the antithesis of those presented here except for the fact that the contract was executed, and not executory, in both cases.

We are convinced that the chancellor erred in his appraisement of the evidence presented. The proof of mental incapacity, when all of the evidence is considered, is neither clear nor convincing. The proof of undue influence does not rise to the dignity of relevant substance.

Judgment reversed, with directions to enter a judgment in conformity with this opinion.