## Lausman et al. v. Brown et al.

Feb. 2, 1943.

Henry I. Fox for appellants.

Robert E. Hogan for appellees.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

The appellants brought this action in the Jefferson circuit court to set aside a deed executed by Jacob Roederer and his wife, Pauline Roederer, conveying certain real estate to Anastasia Brown and H. P. Miller. It is alleged in the original petition that while the deed re-

cites that a valuable consideration was paid the grantors, in truth and fact no consideration was paid or passed to them, and at the time of the signing of the writing the grantors did not know the effect of the said writing. It is alleged that the deed purported to convey to the grantees two acres of land situated on Bon Air Lane in Jefferson county, Kentucky, and was and now is of the value of $1000 per acre, or a total of $2000. Maxwell Brown, husband of Anastasia Brown, and W. Scott Miller, husband of H. P. Miller, were named parties defendant, on the ground that they claimed an interest in the property conveyed by reason of certain legal services rendered the grantors, and claimed to have advanced or loaned grantors the sum of $75 which was used by Brown and Miller in settlement of an asserted claim against the grantors, and they were called upon to set up any interest or claim that they may have if any in and to the property. Later, by amended petition, appellants alleged that at the time of the execution of the deed Jacob Roederer was 75 years of age and Pauline Roederer was 65 years of age; that at the time of the execution of the deed to the wives of Maxwell Brown and W. Scott Miller they, Brown and Miller, were practicing attorneys in the courts of Jefferson county and were and had been representing the grantors as their attorneys and that the relationship of attorney and client existed between Brown and Miller and the appellants and they were at said time acting on the advice of Brown and Miller who presented the writing which they signed, and that by reason of the relationship of attorney and client the appellants signed the writing upon representations made to them at the time by Brown and Miller.

It is to be noticed that it is merely alleged that appellants, grantors, acted upon representations made to them by Brown and Miller, without stating what the representations were or the nature of them, or that the representations were false, or that they were made for the purpose of misleading and defrauding appellants, or that they relied and acted upon the representations, or that they were deceived thereby. Under the rule that a pleading will be construed more strongly against the pleader, it will be presumed that the representations were true and free from fraud and appellants were not deceived thereby. Nor will fraud be inferred from the bare allegations with respect to the ages of grantors, or that the relationship of attorney and client existed be-

tween the grantors and Brown and Miller. The only allegation contained in the petition and the petition as amended which approaches stating a cause of action, is that there was no consideration paid or passed to the grantors for the conveyance. It is also alleged, however, that at the time of the signing of the writing the grantors did not know the effect of it, but this is a mere conclusion of the pleader not supported by any statement of fact tending to show why they did not understand the effect of the writing.

Appellees filed their answer traversing the allegations of the petition, and in paragraph two of the answer they alleged that they had rendered to appellants certain legal services and represented them in certain business transactions, etc. Since the decisive question in the case is whether or not any consideration or adequate consideration was paid or passed to appellants for the conveyance, we here copy paragraph two of the answer relating to the question of consideration.

"Defendants, for further answer, state that, at the special instance and request of said Jacob Roederer, and on numerous and various occasions, said Maxwell Brown and W. Scott Miller, rendered to said Roederer various and sundry legal services, such as preparing wills for himself and his wife, interpreting leases and the terms and provisions thereof, and in other respects rendering to him advice and counsel as to his rights and liabilities under leases, contracts and other writing, and about various sundry other matters and questions, and for which said Roederer obligated himself to pay.

"Defendants further say that said Jacob Roederer had, on or about August 21, 1937, entered into a certain written contract with one J. P. McKeown and one James S. Shaw, whereby and by virtue of which contract said Roederer had agreed to convey to a corporation which said Shaw and McKeown proposed to incorporate, approximately 12 acres of land of said Roederer located adjacent to Bon Air Avenue, in Jefferson County, and by which said contract said Roederer obligated himself, both financially and personally, and otherwise; that said contract was a comprehensive contract, which, among other things, provided for the formation of a corporation and the subdividing of the said 12

acres of land of said Roederer, the financing of same, the selling and marketing of lots, improvement of said subdivision, construction of homes and financing the project; that subsequent to the time said Roederer entered into said contract he became desirous of cancelling and being relieved of the obligations imposed upon him by said contract, and thereupon said Shaw and McKeown refused to release said Roederer from the terms and provisions of said contract or the obligations thereby imposed upon him, and in addition threatened to institute litigation against said Roederer to require him to either specifically perform his part of said contract or pay damages for failure so to do. Defendants further say that said Maxwell Brown and W. Scott Miller were consulted by said Jacob Roederer on numerous and various occasions and that they counseled and advised said Roederer concerning and about matters involved in said contract and said threatened litigation, and rendered to said Roederer various and sundry legal services and advice in connection therewith; and defendants further say that said Brown and Miller were employed by said Roederer to, and that they did, investigate and render to said Roederer various legal services in connection therewith; that they made a full and complete investigation into the contract and the obligation imposed upon Jacob Roederer thereby to determine whether or not the said contract was a valid and enforceable one against Roederer; that in that connection said Brown and Miller had numerous conferences with said Roederer, said Shaw and McKeown and with divers other persons; that they made a thorough investigation and research of the law appertaining thereto and performed various and sundry other legal services in connection therewith, and advised said Roederer that, in their opinion, as attorneys-at-law, the said contract was valid and enforceable against him; whereupon said Roederer requested that said Brown and Miller endeavor to get him released of the obligations imposed upon said Roederer by said contract, and to, if possible, affect a compromise and settlement with said Shaw and McKeown; that said Roederer advised said Brown and Miller, however, that he was without funds with which to effect any such compromise and that he did

not desire to mortgage any of his property with which to raise such funds and further that if he should so mortgage his property he would be wholly unable to make any payments on the mortgage or interest that would be necessary in event of such mortgage being placed upon his property, and that said Jacob Roederer solicited and implored said Brown and Miller to advance him the necessary money that would be required to effectuate said compromise and settlement with said Shaw and McKeown, and at said Jacob Roederer's special instance and request the said Jacob Roederer, on June 25, 1938, entered into a written contract with said Brown and Miller, which said contract was and is in words, figures and phrases as follows, to wit: * * *''

Omitting the preliminary parts of the contract setting out the reason and consideration therefor as indicated in paragraph two of the answer, the contract reads:

"Now, Therefore, the party of the first part, for and in consideration of the indebtedness now due said second parties and for the further and additional indebtedness of said first party to said second parties by reason of certain necessary legal services to be performed in behalf of said first party by said second parties, and for the further and additional consideration of said second parties agreeing to advance the necessary money to settle and satisfy any claim or claims that said James S. Shaw and J. P. McKeown may have against said first party, and to avoid any litigation ensuing therefrom the said first party, for and in consideration of said services and advancements of money heretofore mentioned, does hereby covenant and agree to execute and deliver to said second parties upon the completion of said services and the settlement of said claims a deed for approximately two acres of land lying in Jefferson County, Kentucky, on the Bon-Air Road, now known as the Jacob Roederer tract. It is understood by and between the parties hereto that said conveyance by said first party is the only consideration that they are to receive for said services and advancements of money by them, as heretofore mentioned." The contract was acknowledged and signed by the parties on June 25, 1938.

Appellees further alleged that Brown and Miller ad-

vanced to Jacob Roederer the sum of $60 and fully and faithfully performed the conditions imposed upon them by the contract, and that on or about July 13, 1938, they effected for Roederer a compromise and settlement with Shaw and McKeown and obtained from them a release to Roederer cancelling the contract and relieving him from all claims and liabilities thereunder; that in pursuance of and in compliance with their part of the contract, Roederer and his wife executed, acknowledged and delivered the deed to the property here in question. The appellants filed their reply traversing the allegations contained in paragraph two of the answer, thus completing the issues.

The case was referred to the commissioner of the court with directions to hear proof on all issues of facts presented by the pleadings relating to the consideration, if any, and if so the adequacy of it; the fair and reasonable value of the property involved; fraud in the execution and delivery of the deed; what representations were made if any by Brown and Miller in obtaining the deed; the condition of the grantors as regards mental capacity, etc., and various and sundry other questions, many of which were not raised in the pleadings. In fact, the questions submitted to the commissioner were more comprehensive than warranted by the pleadings. After taking the evidence, which was very voluminous, the commissioner made his report to the chancellor embodying his finding of fact and conclusions of law and recommended that appellants' petition be dismissed and that they take nothing thereby. Appellants filed exceptions to the commissioner's report and after hearing arguments of counsel and a thorough consideration of the matters involved, the chancellor approved and confirmed the commissioner's report and entered judgment dismissing appellants' petition. During the pendency of the case Jacob Roederer died leaving a will in which he named John Lausman and John Reinhard executors of his estate, and the action was revived in the name of the said executors, who are the appellants on this appeal.

The commissioner wrote an opinion consisting of several typewritten pages in which he reviewed the issues, evidence and applicable law, evincing a thorough and careful consideration of the case. The commissioner wrote in part:

"The issues in this case as developed by the

pleadings and proof are simple and easily defined. Although plaintiffs plead that there is no consideration to support the conveyance sought to be set aside, it is quite clear from the pleadings and proof that there was a properly executed written contract between the parties to make said conveyance. It is also quite clear from the pleadings and proof that there was a consideration to support said contract, to-wit, services rendered and money advanced to Roederer by Brown and Miller and we are not concerned here with the adequacy or inadequacy of that consideration. The issues in this case as I see them are only two:

"(1) Did Jacob Roederer by reason of age and physical condition understand the nature, purport and effect of the contract which he signed and the deed which he executed to Brown and Miller.

"(2) Was there such relationship of attorney and client between Brown & Miller and Roederer at the times of these transactions as prevented them dealing on equal terms so that an unfair advantage was taken of said Roederer by said Brown & Miller by reason of said relationship."

The commissioner further pointed out that the proof was conflicting, especially as to the mental and physical condition of Jacob Roederer. It appears from evidence adduced for appellees, and certain parts of the evidence of Jacob Roederer and Mrs. Roederer, that they were mentally competent to execute the deed and understood its purpose and import. On the other hand, there is evidence to the contrary, particularly that of Dr. W. Stuart Carter, who testified that sometime previous to the execution of the deed Jacob Roederer had suffered a stroke of some nature and his physical condition was bad. The doctor expressed the view or opinion that Mr. Roederer was incapable of executing a deed. However, notwithstanding the opinion of the doctor and perhaps other evidence of a similar nature, it appears from the evidence of Jacob Roederer and Mrs. Roederer that they clearly understood the nature and import of the deed at the time they executed it. Mr. Roederer was asked to state whether or not when he signed the deed he was acting on the advice of Brown and Miller as his lawyers, and he answered, "Not when that deed was made." But he later said that Mr. Miller was his lawyer. He was

later asked and answered these questions: "Q. At the time that this deed was said to have been made, that is, on or about July 15th, 1938, were Brown and Miller acting as your lawyers at that time? A. No, sir. Q. Who was? A. McKeown and Shaw." He also said that he signed a paper for Brown and Miller to the two acres of land and said that "they wanted that two acres to pay out the money to McKeown and Shaw, to pay for what they had done for us." Mrs. Roederer, testifying in reference to the two acres of land conveyed, was asked if she knew that she was conveying and passing title along with her husband to that two acres of ground, and she answered in the affirmative, and also admitted that she knew that they would no longer own that two acres of land or have any interest in it after the deed was signed. She said that the two acres of land was located at the end of the twelve acre tract and that she understood that the two acres were to be sold and conveyed by the deed. She further said that neither she nor her husband ever paid Miller or Brown any money for legal services rendered them and that they had no money with which to pay them, and paid them with the two acres of land. She was asked when she first knew the paper was a deed to the two acres of land, and she answered, "When they told us—Brown or Miller, I don't know which one," and that was at the time they signed the deed. She said she did not read the deed but they (Brown and Miller) read it to her. She was asked about Mr. Roederer's physical and mental condition and she said it had been all right up to two or three years ago, but she further said that he knew what he was doing. We have read the testimony of Mr. and Mrs. Roederer and we observe nothing in it indicating lack of memory or mental incapacity, but on the contrary it indicates that they were people of normal or average intelligence, and fully understood the purpose of the deed with respect to what it conveyed and the purpose of the conveyance. See Saylor v. Saylor, 282 Ky. 216, 138, S. W. (2d) 316. Also, subsequent to the execution of the deed Mr. and Mrs. Roederer executed an extensive deed of trust and also executed their wills, and Mr. Roederer's will was probated in the Jefferson county court. It is insisted for appellees, and perhaps with some plausibility, that if Mr. Roederer was competent to execute a deed of trust and a will subsequent to the execution of the deed in question, he was capable of executing the contract and deed.

The commissioner found that the relationship of attorney and client did exist between Mr. and Mrs. Roederer and Brown and Miller at the time of the execution of the deed. Mr. Roederer stated that Brown and Miller were not acting as his lawyers at the time of the execution of the deed, but perhaps he meant that he did not employ them for that purpose, or for other reasons did not understand the meaning or import of the question. The commissioner further found, however, that there was no fraud perpetrated or committed by Brown and Miller in obtaining the deed, notwithstanding the relationship of attorney and client existed. It is commonly known that in fixing attorney fees the relationship of attorney and client must necessarily exist, and should such relationship necessarily vitiate a contract for attorney fees, or afford grounds for the recovery of attorney fees after same has been paid, then all litigants who may conceive the idea that the attorney fees were exorbitant or more than they should have paid, could come into court and set aside the contract or recover back from the attorney such amount, or a part thereof so paid. We agree with the commissioner and the chancellor that the relationship of attorney and client standing alone does not raise a presumption of fraud. We find neither allegation nor evidence conducing to show that Brown and Miller committed any fraud upon Mr. and Mrs. Roederer in the execution of the deed.

With respect to the value of the two acres of land conveyed, the evidence is conflicting. It is insisted for appellants that the land was suitable for subdivision purposes and, therefore, very valuable. On the other hand, it is shown that the land is not suitable for subdivision purposes in its present state and would require the expenditure of many thousands of dollars for utilities and other improvements and that after spending such amount of money it is improbable that the property could then be sold at a price sufficient to produce a fair return on the investment. It is further shown that other land a few hundred feet from the land in question was sold in December, 1938, for less than $300 an acre, and this land had a better lay or was more valuable for subdivision purposes than the Roederer land. One witness who had experience in purchasing and selling land for subdivision purposes testified that the fair market value of the land in question at the time it was conveyed would not have

exceeded $350 per acre provided someone *wanted* to buy it, but that it would not bring that much if it was put on the market. There was other evidence, of course, tending to show that the land was of a greater value than that stated by the witness above, but the weight of the evidence tends to show that the two acres of land was worth six or seven hundred dollars. The commissioner found that to carry out and finance the subdivision idea or plan as embodied in the contract between Roederer and McKeown and Shaw, a loan of about $10,000 would have been necessary and would have required a mortgage of that sum on the land, since Roederer had no funds for that purpose. Roederer became dissatisfied with the contract and was intensely interested in obtaining a release therefrom, which was effectuated through and by the efforts of his attorneys, Brown and Miller. In view of the services rendered by Brown and Miller as set out in paragraph two of their answer which was sustained by evidence of a substantial nature, and particularly in securing a rescission of the contract between Roederer and McKeown and Shaw, which Mr. Roederer conceived to be a bad one for him, we do not think that the sacrifice of the two acres of land was an exorbitant or unreasonable remuneration for the services rendered by Brown and Miller.

We here quote with approval that part of the chancellor's opinion setting out the circumstances and facts relating to the value of the land and the reasonableness of the attorneys' fee:

"Plaintiffs' counsel argues that the attorneys' services in obtaining a release from the contract to subdivide were of little value because the release was obtained by the payment of $60.00 only. The services covered a period of many months and the amount paid in settlement of a claim is certainly not the criterion as to the value of the services rendered. It would not be contended that had the attorneys paid more they would have been entitled to a larger fee. In August 1937 Roederer owned a twelve acre home tract near Bowman Field. The city was developing in that vicinity. His health was bad, he could no longer work and he had visions of subdividing the home place. It is common knowledge that the development of subdivisions requires a large outlay of capital and Roederer had no capital. He

entered into a binding written contract with a real estate man who had no capital and also a lawyer. By the terms of this contract, he agreed to convey the land to a corporation to be formed; Messrs. McKeown and Shaw agreeing to contribute their services in developing a subdivision and rendering legal services and further to assist in raising the necessary capital and selling stock in the company to be formed.

"The history of these ventures is common knowledge, to say the least they are highly speculative. Active and shrewd owners have lost fortunes. It is probable that without money capital could not have been raised without a mortgage on the land which could have been paid off only by the sale of lots after the development was completed. One tract at least in this vicinity had been subdivided and the lots had not been sold. The development and sales might have been slow but the interest on the mortgage would have continued day and night.

"At all events, Roederer finally realized the hazard and sought the advice of experienced lawyers of high standing who made an investigation of the set-up. Their investigation disclosed that to develop the property under the zoning laws and to install necessary public utilities; construct necessary roads and so forth, would require a large sum of money and a mortgage on the home place, to the extent of some $10,000.00. It was their opinion that the plan of development as set out in the contract, the terms of which their client had obligated himself to perform, was impracticable. Their client agreed with their decision and employed the lawyers to undertake to get him relieved from the obligations of the contract. This, they were successful in doing.

"Faced with the possibility of losing the entire twelve acres, including the home, and being without any money, Roederer entered into a contract by the terms of which he agreed to pay his attorneys, if successful, by the conveyance of two acres of the land out of the twelve acre tract. The evidence shows that this was Roederer's own proposal and this record does not justify the assumption that the services were not worth the value of the land con-

veyed. Roederer thought they were and in the light of the common experience of others in developing subdivisions, the services of these lawyers probably saved ten of the twelve acres and the improvements. Roederer's decision under the circumstances certainly cannot be held to establish either that he lacked mental capacity at the time he agreed to pay the fee or that he did not make a shrewd bargain by which he preserved ten acres and his home. Messrs. McKeown and Shaw, under their contract, were in a position to profit a great deal and risk nothing. The entire risk was upon Roederer. They wanted a considerable sum to release Roederer and finally agreed to and did accept a very small sum. The amount of the settlement after long negotiation indicates the value of the services rendered and probably these services inured to the benefit of the beneficiaries under Roederer's will who are now the owners of the remaining ten acres of land with improvements subject to subdivision development, if desired.

"The expert testimony as to the value of the services is not satisfactory or controlling nor do I think that the plaintiffs have satisfactorily established the exaggerated value of the acreage set out in the petition. I am satisfied that Roederer had mental capacity to make the contract he did make with his lawyers and even further that under the circumstances, he made a good bargain.

"The facts set out in the opinions of the Court of Appeals in the numerous cases relied on by plaintiff are entirely different in character."

Appellants cite and rely upon a number of opinions of this court as authority to support their position, among which are the cases of Shacklette v. Goodall, 151 Ky. 20, 151 S. W. 23; Dotson v. Patterson, 160 Ky. 18, 169 S. W. 497; Jacobs' Executor v. Meyers, 185 Ky. 594, 215 S. W. 532; Maddox v. Maddox, 258 Ky. 121, 79 S. W. (2d) 402, and other cases of a similar or like nature. We have examined these authorities and agree with the chancellor that they are distinguishable from the facts in the present case and do not support appellants' position.

Although mental incapacity, misrepresentation and fraud were not alleged in the petition, yet since these

questions were submitted to the commissioner and developed in the evidence as though they were made an issue in the pleadings, and if it be conceded that the evidence cured the defect, yet the burden was upon appellants to prove such facts. It is familiar law that an executed contract will not be lightly set aside in the absence of clear and convincing evidence. We do not think that appellant sustained that burden. See, Saylor v. Saylor, 282 Ky. 246, 138 S. W. (2d) 316; Tartar v. Eaton, 282 Ky. 219, 138 S. W. (2d) 342; Rucker v. Rucker, 272 Ky. 513, 114 S. W. (2d) 770; Sharp v. Culton, 262 Ky. 84, 90 S. W. (2d) 869.

It is also the rule that this court will not reverse the finding of a chancellor where the evidence is conflicting and such as to leave reasonable minds in doubt as to the truth of it. And, this rule applies with even more force when the finding is concurred in by both a commissioner and chancellor. We conclude, therefore, that the evidence is sufficient to sustain the judgment.

Judgment affirmed.