### BROWN v. L. V. MARKS & SONS CO.
#### No. 72.

District Court, E. D. of Kentucky, Catlettsburg Division.
Feb. 6, 1946.

Roy Wilhoit, of Vanceburg, Ky., and Woodward, Dawson, Hobson & Fulton, of Louisville, Ky., for plaintiff.

Cohen, Hurtig & Cohen, of Cincinnati, Ohio, for defendant.

SWINFORD, District Judge.

The defendant is a manfacturer of ladies shoes. For many years it has operated two factories in Kentucky. One of them at Augusta, the other at Vanceburg. The plaintiff was the superintendent of the Vanceburg plant. He had been connected with the shoe manufacturing business for many years before he was employed by the defendant. His employment by the defendant commenced in 1934 or 1935.

In 1938 he devised certain new features in connection with the sole of the shoe which produced a cushion or resilient effect. These new features were disclosed to the officers of the defendant company, who became enthusiastic about them. With the plaintiff's consent the defendant secured patents on these inventions. The patents were issued in the name of the plaintiff, Mark L. Brown, and Emanuel S. Marks as co-inventors, both of whom executed assignments of the patents to the defendant. In all there were three different new features covered by three separate patents. Patent No. 2,207,437 was issued on July 9, 1940, covering the invention used in what is designated as the "Aerotized" shoe. Patent No. 2,300,739, issued on November 3, 1942, was utilized in the construction of a shoe called "Cushomatic" insole. Patent No. 2,320,321, issued May 25, 1943, was a development and new feature for the "welt" type construction.

My conclusions in this case affect all of these patents alike so there is no need to identify them further for distinguishing features.

It is alleged by the plaintiff that at the time of the assignments of the inventions the defendant, in consideration of the assignments, agreed to pay him a reasonable royalty on each pair of shoes sold.

The shoes were well accepted by the trade and were in such demand that both plants were almost immediately converted to the exclusive manufacture of the Aerotized and Cushomatic shoes.

It should be pointed out that while the patents were issued in the names of Emanuel S. Marks and Mark L. Brown as co-inventors, Marks had but little to do with the invention and I find was not in fact co-inventor. The whole new ideas embraced in the patented articles came from Brown and the few simple suggestions from Marks do not entitle him to any credit for the ultimately patented articles.

The plaintiff seeks to have the assignments set aside because of fraud in the procurement, asks for an accounting for the sale of all shoes manufactured under the patents, and that the defendant be perpetually enjoined from further manufacture of shoes under the patents.

The defendant rests its defense on three main issues: First, that there was no contract either express or implied to pay royalty. Second, that it is entitled to "shop rights", since the invention was conceived and perfected by the plaintiff on the defendant's time and with the use of its materials. Third, that any claim which the plaintiff may have had is barred by laches.

I must conclude from the record that there was an express contract to pay the plaintiff a reasonable royalty. The conclusion is based on the positive testimony of the plaintiff, which is corroborated by subsequent events about which there is no dispute. The defendant spends much time arguing that the invention added little or nothing to the art. This argument can hardly be accepted. When the idea was presented to Emanuel Marks, who in turn took it to the home office in Cincinnati, for examination by other executives and responsible employees of the company, it was received with enthusiasm. The defendant immediately set about to have patents issue and to have an assignment to it of exclusive rights in the invention. The defendant's witness, McGovern, a stockholder and chief salesman of the company, testified that at the Boston shoe show in 1938 the idea of a cushioned or resilient soled shoe was "in the air" and all the talk among shoe men. Therefore, due to the initiative and inventive genius of the plaintiff, the defendant was enabled to take advantage of this "stir" in the industry and put on the market, ahead of competitors, the new idea in shoe construction. Further, it is significant that the defendant abandoned entirely any other type of construction and converted both of its plants into the manufacture of Aerotized and Cushomatic shoes. Neither is the defendant in a very enviable light in attempting now to minimize the novelty in this construction. When it was seeking the patent it was strenuously urging that this was a radical change in shoe construction previously unknown to the art. At that time the defendant was sufficiently plausible in the advocacy of the Aerotized and Cushomatic shoes to have patents issue on them. It further appears from the record that the defendant company had for "four or five years" licensed a large manufacturer of shoes under these patents and had received royalties for the license granted.

There is another fact which I think infers that there must have been some understanding between the parties that the plaintiff should be compensated for making the assignments of the patents. The plain-

tiff, a resident of Vanceburg during his employment as the defendant's superintendant, decided to build a house. He purchased from the defendant a building lot in the town of Vanceburg for the sum of $800 and paid $100 down. Later after conference between executives and stockholders of the company the $100 was refunded and a deed to the lot was executed and delivered to the plaintiff and his wife as a gift. This was in June 1940, after the shoes were in production. This fact strongly indicates an effort to placate the plaintiff and to forestall any claim under the agreement. It is not a strong circumstance but one to be considered in the light of other facts.

On the whole case the plaintiff has sustained the burden of proving by a preponderance of evidence through testimony and all reasonable inferences that may be drawn from it that there was an express agreement to pay a reasonable royalty for the assignment of the exclusive patent rights.

█ Having established that there was such a contract, the plaintiff assumes the burden of proving that it was procured by fraud and asks that because of the fraud it be annulled and the assignment cancelled. To establish fraud in the procurement of a contract is one of the most difficult burdens that can be assumed by a litigant. Brown asks the court to cancel his assignment of the patent rights. This valid written obligation is attacked because as he claims there was a preconceived plan on the part of the defendant to defraud him and wrongfully obtain these valuable patents. The plaintiff rests his case upon the following statement of law from 23 Am.Jur. 885, § 106: "A majority of American courts hold that fraud may be predicated on promises made with a present intention not to perform them or, as the rule is frequently expressed, on promises made without an intention of performance, and that for such fraudulent promise, relief may be had in equity or law, as the circumstances and issues presented demand. Recourse may therefore be had for such promises, made for the purpose of deceiving the promisee and inducing him to act, where otherwise he would not do so, in such a way as to affect his legal right or to alter his position to his injury or risk, as by making and entering into disadvantageous contracts or in some way giving over, transferring, or surrendering real or personal property or rights therein to the person who makes the fraudulent promise. The gist of the fraud in such cases is not the breach of the agreement to perform, but the fraudulent intent of the promisor, the false representation of an existing intention to perform where such intent is in fact nonexistent, and the deception of the obligee by such false promise. The generally accepted modern theory categorizes a promise which the promisor does not intend to carry out as a misstatement of material and subsisting fact, recognizing, in the oft-quoted language of Lord Bowen, that: "There must be a misstatement of an existing fact; but the state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else. A misrepresentation as to the state of a man's mind is therefore a misstatement of fact."

█ It is thus seen that he must produce proof of the highest dignity in order to sustain his case. The case of Dolle v. Melrose Properties, 252 Ky. 482, 67 S.W.2d 706, 709, expresses the rule on which the plaintiff rests his case, in the following language: "A charge of fraud may be predicated on the nonperformance of a promise, where the promise is accompanied by a present intention not to perform, and is made to deceive the promisee." Citing, Jones v. Brammer, 229 Ky. 649, 17 S.W.2d 736. See also Kentucky Road Oiling Co. v. Sharp, 257 Ky. 378, 78 S.W.2d 38, and Kentucky Cardinal Coal Corp. v. Delph, 296 Ky. 295, 176 S.W.2d 886.

In order for the court to so find the evidence must be clear, unequivocal and convincing. The evidence must be of such character that it does not leave the court in any doubt that fraud was practiced and the plaintiff acted only because of the fraudulent misrepresentation.

█ The case insofar as it seeks to establish fraud in the procurement fails. In fact I can find no evidence that remotely suggests that there was an intention on the part of the defendant and its agents to filch the patents from the plaintiff at the time of the assignment. There have been instances in the law in which such a case was established, but the plaintiff fails to make

out such a case here. Whatever fraud there may be was in failing to comply with the contract after it was made. The facts here more nearly fall within the latter part of section 106 of American Jurisprudence, volume 23: "In order to render nonperformance of a promise fraudulent, the intention not to perform must exist when the promise is made; and if the promise is made in good faith when the contract is entered into, there is no fraud, even though · the promisor subsequently changes his mind and fails or refuses to perform. Moreover, there is no inference of fraudulent intent not to perform from the mere fact that a promise made is subsequently not performed."

The Circuit Court of Appeals for the Sixth Circuit has well expressed the rule applicable here in the following quotation with authorities, from Bowen v. B. F. Goodrich Co., 36 F.2d 306, 308: "The issue is thus reduced to a question of veracity between appellant and the witness Eakin, as illuminated by the circumstances disclosed in the record. Before noticing these circumstances we observe that where a complainant seeks a rescission of an executed instrument upon the ground of fraud, he must establish the fraud by evidence that is clear and convincing. Atlantic Co. v. James, 94 U.S. 207, 24 L.Ed. 112; Maxwell Land-Grant Case [United States v. Maxwell Land-Grant Co.], 121 U.S. 325, 7 S.Ct. 1015, 30 L.Ed. 949; Lalone v. United States, 164 U.S. 255, 17 S.Ct. 74, 41 L.Ed. 425."

All Kentucky decisions are in line with this rule. Lincoln-Income Life Ins. Co. v. Kraus, 279 Ky. 842, 132 S.W.2d 318; Lausman et al. v. Brown et al., 293 Ky. 95, 168 S.W.2d 579; T. M. Crutcher Laboratory v. Crutcher, 288 Ky. 709, 157 S.W.2d 314; Pacific Mutual Life Ins. Co. v. Arnold, 262 Ky. 267, 90 S.W.2d 44; Dotson v. Norman et al., 159 Ky. 786, 169 S.W. 527. In Lincoln-Income Life Ins. Co. v. Kraus, supra, the court used this language [279 Ky. 842, 132 S.W.2d 320]: "It is likewise well established that a duly executed written contract will not be set aside and ignored, upon the ground of fraud in its procurement, unless the testimony clearly establishes the fraud, and the burden is upon the one asserting it to furnish the evidence necessary for that purpose."

It would serve no good purpose to further review the reported case involving the question of fraud in the procurement.

Since I have found that there was an express contract the question of shop rights is no longer important. There can be no claim for shop rights where the parties have agreed on a royalty basis. However, since the question of shop rights is somewhat related I am constrained to call attention to the rule stated in United States v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488. The cases of Gill v. United States, 160 U.S. 426, 16 S.Ct. 322, 40 L.Ed. 480; Dalzell v. Dueber Watch Case Mfg. Co., 149 U.S. 315, 13 S.Ct. 886, 37 L.Ed. 749; and Standard Parts Co. v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560, 32 A.L.R. 1033, are considered and Mr. Justice Roberts' comprehensive statement of the law is in the light of all that has theretofore been said. The rule there stated is [289 U.S. 178, 53 S.Ct. 558]:

"Recognition of the nature of the act of invention also defines the limits of the so-called shop right, which, shortly stated, is that, where a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he obtains a patent, he must accord his master a nonexclusive right to practice the invention. McClurg v. Kingsland, 1 How. 202, 11 L. Ed. 102; Solomons · v. United States, 137 U.S. 342, 11 S.Ct. 88, 34 L.Ed. 667; Lane & Bodley Co. v. Locke, 150 U.S. 193, 14 S.Ct. 78, 37 L.Ed. 1049. This is an application of equitable principles. Since the servant uses his master's time, facilities, and materials to attain a concrete result, the latter is in equity entitled to use that which embodies his own property and to duplicate it as often as he may find occasion to employ similar appliances in his business. But the employer in such a case has no equity to demand a conveyance of the invention, which is the original conception of the employee alone, in which the employer had no part. This remains the property of him who conceived it, together with the right conferred by the patent, to exclude all others than the employer from the accruing benefits. These principles are settled as respects private employment."

As late as October 9, 1945, the Kentucky Court of Appeals in an opinion referred to the Dubilier case and used this language: "The testimony covered a wide range and tended to establish that the invention was perfected and utilized under such circum-

stances as to entitle appellant to 'shop rights', that is, the right to use said invention in its business without the payment of royalty." Ashland Oil & Refining Co. v. Dorton, 300 Ky. 385, 189 S.W.2d 394, 395.

█ Notwithstanding certain language which is used in earlier cases I cannot conclude in the light of the Dubilier case that estoppel is longer an essential element in establishing shop rights. Frequently it is present and must strengthen the case but there may be shop rights to a discovery in industry without past development. There is a vested property right which equity fixes in the invention at its inception. Where the employee makes his discovery while working with the employer's tools, machinery and materials and on the employer's time the interest or shop right in favor of the employer attaches immediately. I quote the following pertinent language from 32 A.L.R. 1041:

"In addition to the cases cited in the earlier annotation on this question, holding that the employer had, at least, a license or shop right to use the invention made by the employee, is Wiegand v. Dover Mfg. Co., D.C., 1923, 292 F. 255, in which the court followed the decision in Gill v. United States, 1896, 160 U.S. 426, 16 S.Ct. 322, 40 L.Ed. 480, to the effect that the mere fact that the employee conceived and made the original drawings of the invention on his own free time and at his own home, outside of working hours, would not take the case out of the rule entitling the employer to a license to use the invention, where the same was developed and put into practical operation in the employer's factory and at the latter's expense, the employer, on the principle of an estoppel in pais, being entitled to such a license or shop right. The court said that the entire development and reduction to practice was made at the risk, cost, and expense of the employer; that its accumulated store of experience and its materials and facilities were placed at the disposal of the employee; that it was in this atmosphere, and under the pressure of business necessity, that the inventions were produced, and that whatever originality the employee contributed was only one factor in their evolution; that if the employee's contentions were sound the result would be that he entered the employment with nothing, and three years later left it, the practical owner of the employer's business."

█ The remaining question of laches as a defense admits of little consideration. This is not a stale claim within the meaning of equity. The plaintiff and defendant began their consideration of these patents in March, 1938, and continued so long as the plaintiff was in the defendant's employ, which lasted until 1942. The action was brought November 10, 1943. The last patent did not issue until May 25, 1943. Negotiations and discussions were being held constantly between the parties. The plaintiff says that he spoke to Emanuel Marks several times about the royalty promise but that Marks stated it was necessary to first see how well the shoes sold and how many "repeat" orders were received by the company. This is a most reasonable explanation. Certainly no chancellor would deny recovery on the ground that the plaintiff had unduly delayed seeking redress. I feel that the record so clearly sustains my finding on this point that citation of authorities is unnecessary. I point out, however, that in Howard v. Howe, 7 Cir., 61 F.2d 577, where the same defense was made, there was a lapse of nineteen years between the assignment of the patent and the claim for remuneration. See also Galliher v. Cadwell, 145 U.S. 368, 12 S.Ct. 873, 36 L.Ed. 738; Northern Pacific R. Co. v. Boyd, 9 Cir., 177 F. 804. In affirming the decision in the Boyd case, 228 U.S. 482, 33 S.Ct. 554, 562, 57 L.Ed. 931, the Supreme Court said: "Unless the nonaction of the complainant operated to damage the defendant, or to induce it to change its position, there is no necessary estoppel arising from the mere lapse of time." There is no indication that the defendant has been damaged by the alleged delay in the case at bar.

█ The justice of this case demands that the plaintiff should receive a reasonable royalty for his discovery and invention. The defendant has profited through his genius and should not be permitted to exploit the patents and ignore the inventor.

Under the present state of the record the plaintiff's whole case must fail, since I find that no fraud was practiced in the procurement of the assignments and since there is no prayer for a reasonable royalty. The plaintiff is given thirty days to amend his complaint to conform to the proof. Federal Rules of Civil Procedure, rule 15, 28 U.S.C.A. following section 723c; McDowall v. Orr Felt & Blanket Co., 6 Cir.,

146 F.2d 136. If at the end of that time no steps are taken, the complaint will be dismissed at the plaintiff's cost.

Findings of fact and conclusions of law are this day filed.